# OHIO FORESTRY ASSOCIATION, INC. *v.* SIERRA CLUB ET AL.

No. 97–16.   Argued February 25, 1998—Decided May 18, 1998

Breyer, J., delivered the opinion for a unanimous Court.

*Malcolm L. Stewart* argued the cause for the federal respondents in support of petitioner, under this Court's Rule

12.6.   With him on the briefs were *Solicitor General Waxman, Assistant Attorney General Schiffer,* and *Deputy Solicitor General Kneedler.*

*Steven P. Quarles* argued the cause for petitioner.   With him on the briefs were *Clifton S. Elgarten, Thomas R. Lundquist,* and *William R. Murray.*

*Frederick M. Gittes* argued the cause for respondents. With him on the brief were *Patti A. Goldman, Todd D. True,* and *Alex Levinson.**

JUSTICE BREYER delivered the opinion of the Court.

The Sierra Club challenges the lawfulness of a federal land and resource management plan adopted by the United States Forest Service for Ohio's Wayne National Forest on the ground that the plan permits too much logging and too much clearcutting.   We conclude that the controversy is not yet ripe for judicial review.

I

The National Forest Management Act of 1976 (NFMA) requires the Secretary of Agriculture to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System."   90 Stat. 2949, as renumbered and amended, 16 U. S. C. § 1604(a). The System itself is vast.   It includes 155 national forests, 20 national grasslands, 8 land utilization projects, and other lands that together occupy nearly 300,000 square miles of land located in 44 States, Puerto Rico, and the Virgin Islands.   § 1609(a); 36 CFR § 200.1(c)(2) (1997); Office of the

---

*Briefs of *amici curiae* urging reversal were filed for the Alabama Forestry Association et al. by *Charles Rothfeld;* for Forest Service Employees for Environmental Ethics et al. by *Michael Axline;* for the Pacific Legal Foundation by *Robin L. Rivett;* for the Southeastern Ohio Oil & Gas Association by *James S. Huggins* and *M. Dale Leeper;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *Richard A. Samp.*

*William V. Luneburg* filed a brief for the Institute for Fisheries Resources et al. as *amici curiae.*

Federal Register, United States Government Manual 135 (1997/1998). The National Forest Service, which manages the System, develops land and resource management plans pursuant to NFMA, and uses these forest plans to "guide all natural resource management activities," 36 CFR § 219.1(b) (1997), including use of the land for "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U. S. C. § 1604(e)(1). In developing the plans, the Service must take both environmental and commercial goals into account. See, *e. g.*, § 1604(g); 36 CFR § 219.1(a) (1997).

This case focuses upon a plan that the Forest Service has developed for the Wayne National Forest located in southern Ohio. When the Service wrote the plan, the forest consisted of 178,000 federally owned acres (278 sq. mi.) in three forest units that are interspersed among privately owned lands, some of which the Forest Service plans to acquire over time. See Land and Resource Management Plan, Wayne National Forest, United States Department of Agriculture, Forest Service, Eastern Region (1987) 1–3, 3–1, A–13 to A–17 (hereinafter Plan). The Plan permits logging to take place on 126,000 (197 sq. mi.) of the federally owned acres. *Id.*, at 4–7, 4–180. At the same time, it sets a ceiling on the total amount of wood that can be cut—a ceiling that amounts to about 75 million board feet over 10 years, and which, the Plan projects, would lead to logging on about 8,000 acres (12.5 sq. mi.) during that decade. *Id.*, at 4–180. According to the Plan, logging on about 5,000 (7.8 sq. mi.) of those 8,000 acres would involve clearcutting, or other forms of what the Forest Service calls "even-aged" tree harvesting. *Id.*, at 3–5, 4–180.

Although the Plan sets logging goals, selects the areas of the forest that are suited to timber production, 16 U. S. C. § 1604(k), and determines which "probable methods of timber harvest" are appropriate, § 1604(f)(2), it does not itself authorize the cutting of any trees. Before the Forest Service can permit the logging, it must: (a) propose a specific area in

which logging will take place and the harvesting methods to be used, Plan 4–20 to 4–25; 53 Fed. Reg. 26835–26836 (1988); (b) ensure that the project is consistent with the Plan, 16 U. S. C. § 1604(i); 36 CFR § 219.10(e) (1997); (c) provide those affected by proposed logging notice and an opportunity to be heard, 106 Stat. 1419 (note following 16 U. S. C. § 1612); 36 CFR pt. 215, § 217.1(b) (1997); Plan 5–2; (d) conduct an environmental analysis pursuant to the National Environmental Policy Act of 1969 (NEPA), 42 U. S. C. § 4332 *et seq.;* Plan 4–14, to evaluate the effects of the specific project and to contemplate alternatives, 40 CFR §§ 1502.14, 1508.9(b) (1997); Plan 1–2; and (e) subsequently make a final decision to permit logging, which affected persons may challenge in an administrative appeals process and in court, see 106 Stat. 1419–1420 (note folowing 16 U. S. C. § 1612); 5 U. S. C. § 701 *et seq.* See also 53 Fed. Reg. 26834–26835 (1988); 58 Fed. Reg. 19370–19371 (1993). Furthermore, the statute requires the Forest Service to "revise" the Plan "as appropriate." 16 U. S. C. § 1604(a). Despite the considerable legal distance between the adoption of the Plan and the moment when a tree is cut, the Plan's promulgation nonetheless makes logging more likely in that it is a logging precondition; in its absence logging could not take place. See *ibid.* (requiring promulgation of forest plans); § 1604(i) (requiring all later forest uses to conform to forest plans).

When the Forest Service first proposed its Plan, the Sierra Club and the Citizens Council on Conservation and Environmental Control each objected. In an effort to bring about the Plan's modification, they (collectively Sierra Club), pursued various administrative remedies. See Administrative Decision of the Chief of the Forest Service (Nov. 14, 1990), Pet. for Cert. 66a; Appeal Decision, Wayne National Forest Land and Resource Management Plan (Jan. 14, 1992), *id.,* at 78a. The Sierra Club then brought this lawsuit in federal court, initially against the Chief of the Forest Service, the Secretary of Agriculture, the Regional Forester, and the

Forest Supervisor. The Ohio Forestry Association, some of whose members harvest timber from the Wayne National Forest or process wood products obtained from the forest, later intervened as a defendant.

The Sierra Club's second amended complaint sets forth its legal claims. That complaint initially states facts that describe the Plan in detail and allege that erroneous analysis leads the Plan wrongly to favor logging and clearcutting. Second Amended Complaint ¶¶ 13–47 (hereinafter Complaint), App. 16–23. The Complaint then sets forth three claims for relief.

The first claim for relief says that the "defendants in approving the plan for the Wayne [National Forest] and in directing or permitting below-cost timber sales accomplished by means of clearcutting" violated various laws including the NFMA, the NEPA, and the Administrative Procedure Act. Complaint ¶ 49, *id.*, at 24.

The second claim says that the "defendants' actions in directing or permitting below-cost timber sales in the Wayne [National Forest] under the plan violate [their] duties as public trustees." Complaint ¶ 52, *ibid.*

The third claim says that, in selecting the amount of the forest suitable for timber production, the defendants followed regulations that failed properly to identify "economically unsuitable lands." Complaint ¶¶ 54–58, *id.*, at 25–26. It adds that, because the Forest Service's regulations thereby permitted the Service to place "economically unsuitable lands" in the category of land where logging could take place, the regulations violated their authorizing statute, NFMA, 16 U. S. C. § 1600 *et seq.*, and were "arbitrary, capricious, an abuse of discretion, and not in accordance with law," pursuant to the Administrative Procedure Act, 5 U. S. C. § 701 *et seq.* Complaint ¶ 60, App. 26.

The Complaint finally requests as relief: (a) a declaration that the Plan "is unlawful as are the below-cost timber sales and timbering, including clearcutting, authorized by the

plan," (b) an "injunction prohibiting the defendants from permitting or directing further timber harvest and/or below-cost timber sales" pending Plan revision, (c) costs and attorney's fees, and (d) "such other further relief as may be appropriate." Complaint ¶¶ (a)–(d), id., at 26–27.

The District Court reviewed the Plan, decided that the Forest Service had acted lawfully in making the various determinations that the Sierra Club had challenged, and granted summary judgment for the Forest Service. *Sierra Club* v. *Robertson*, 845 F. Supp. 485, 503 (SD Ohio 1994). The Sierra Club appealed. The Court of Appeals for the Sixth Circuit held that the dispute was justiciable, finding both that the Sierra Club had standing to bring suit, and that since the suit was "ripe for review," there was no need to wait "until a site-specific action occurs." *Sierra Club* v. *Thomas*, 105 F. 3d 248, 250 (1997). The Court of Appeals disagreed with the District Court about the merits. It held that the Plan improperly favored clearcutting and therefore violated NFMA. *Id.*, at 251–252. We granted certiorari to determine whether the dispute about the Plan presents a controversy that is justiciable now, and if so, whether the Plan conforms to the statutory and regulatory requirements for a forest plan.

## II

Petitioner alleges that this suit is nonjusticiable both because the Sierra Club lacks standing to bring this case and because the issues before us—over the Plan's specifications for logging and clearcutting—are not yet ripe for adjudication. We find that the dispute is not justiciable, because it is not ripe for court review. Cf. *Steel Co.* v. *Citizens For Better Environment*, ante, at 100–101, n. 3.

As this Court has previously pointed out, the ripeness requirement is designed

"to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract

disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 148–149 (1967).

In deciding whether an agency's decision is, or is not, ripe for judicial review, the Court has examined both the "fitness of the issues for judicial decision" and the "hardship to the parties of withholding court consideration." *Id.*, at 149. To do so in this case, we must consider: (1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented. These considerations, taken together, foreclose review in the present case.

First, to "withhol[d] court consideration" at present will not cause the parties significant "hardship" as this Court has come to use that term. *Ibid.* For one thing, the provisions of the Plan that the Sierra Club challenges do not create adverse effects of a strictly legal kind, that is, effects of a sort that traditionally would have qualified as harm. To paraphrase this Court's language in *United States* v. *Los Angeles & Salt Lake R. Co.*, 273 U. S. 299, 309–310 (1927) (opinion of Brandeis, J.), they do not command anyone to do anything or to refrain from doing anything; they do not grant, withhold, or modify any formal legal license, power, or authority; they do not subject anyone to any civil or criminal liability; they create no legal rights or obligations. Thus, for example, the Plan does not give anyone a legal right to cut trees, nor does it abolish anyone's legal authority to object to trees being cut.

Nor have we found that the Plan now inflicts significant practical harm upon the interests that the Sierra Club advances—an important consideration in light of this Court's

modern ripeness cases. See, e. g., *Abbott Laboratories*, *supra*, at 152–154. As we have pointed out, before the Forest Service can permit logging, it must focus upon a particular site, propose a specific harvesting method, prepare an environmental review, permit the public an opportunity to be heard, and (if challenged) justify the proposal in court. *Supra*, at 729–730. The Sierra Club thus will have ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain. Any such later challenge might also include a challenge to the lawfulness of the present Plan if (but only if) the present Plan then matters, *i. e.*, if the Plan plays a causal role with respect to the future, then-imminent, harm from logging. Hence we do not find a strong reason why the Sierra Club must bring its challenge now in order to get relief. Cf. *Abbott Laboratories*, *supra*, at 152.

Nor has the Sierra Club pointed to any other way in which the Plan could now force it to modify its behavior in order to avoid future adverse consequences, as, for example, agency regulations can sometimes force immediate compliance through fear of future sanctions. Cf. *Abbott Laboratories*, *supra*, at 152–153 (finding challenge ripe where plaintiffs must comply with Federal Drug Administration labeling rule at once and incur substantial economic costs or risk later serious criminal and civil penalties for unlawful drug distribution); *Columbia Broadcasting System, Inc.* v. *United States*, 316 U. S. 407, 417–419 (1942) (finding challenge ripe where plaintiffs must comply with burdensome Federal Communications Commission rule at once or risk later loss of license and consequent serious harm).

The Sierra Club does say that it will be easier, and certainly cheaper, to mount one legal challenge against the Plan now, than to pursue many challenges to each site-specific logging decision to which the Plan might eventually lead. It does not explain, however, why one initial site-specific victory (if based on the Plan's unlawfulness) could not, through

preclusion principles, effectively carry the day. See *Lujan v. National Wildlife Federation*, 497 U. S. 871, 894 (1990). And, in any event, the Court has not considered this kind of litigation cost saving sufficient by itself to justify review in a case that would otherwise be unripe. The ripeness doctrine reflects a judgment that the disadvantages of a premature review that may prove too abstract or unnecessary ordinarily outweigh the additional costs of—even repetitive— postimplementation litigation. See, *e. g., ibid.* ("The case- by-case approach . . . is understandably frustrating to an or- ganization such as respondent, which has as its objective across-the-board protection of our Nation's . . . forests . . . . But this is the traditional, and remains the normal, mode of operation of the courts"); *FTC v. Standard Oil Co. of Cal.*, 449 U. S. 232, 244 (1980); *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U. S. 1, 24 (1974); *Petroleum Exploration, Inc. v. Public Serv. Comm'n*, 304 U. S. 209, 222 (1938).

Second, from the agency's perspective, immediate judicial review directed at the lawfulness of logging and clearcutting could hinder agency efforts to refine its policies: (a) through revision of the Plan, *e. g.*, in response to an appropriate pro- posed site-specific action that is inconsistent with the Plan, see 53 Fed. Reg. 23807, 26836 (1988), or (b) through applica- tion of the Plan in practice, *e. g.*, in the form of site-specific proposals, which are subject to review by a court applying purely legal criteria. Cf. *Abbott Laboratories, supra*, at 149; *Pacific Gas & Elec. Co. v. State Energy Resources Con- servation and Development Comm'n*, 461 U. S. 190, 201 (1983). Cf. *Standard Oil Co., supra*, at 242 (premature re- view "denies the agency an opportunity to correct its own mistakes and to apply its expertise"). And, here, the possi- bility that further consideration will actually occur before the Plan is implemented is not theoretical, but real. See, *e. g.*, 60 Fed. Reg. 18886, 18901 (1995) (forest plans often not fully implemented), *id.*, at 18905–18907 (discussing process for amending forest plans); 58 Fed. Reg. 19369, 19370–19371

(1993) (citing administrative appeals indicating that plans are merely programmatic in nature and that plan cannot foresee all effects on forest); Appeal Nos. 92–09–11–0008, 92–09–11–0009 (Lodging II) (successful Sierra Club administrative appeals against Wayne timber harvesting site-specific projects). Hearing the Sierra Club's challenge now could thus interfere with the system that Congress specified for the agency to reach forest logging decisions.

Third, from the courts' perspective, review of the Sierra Club's claims regarding logging and clearcutting now would require time-consuming judicial consideration of the details of an elaborate, technically based plan, which predicts consequences that may affect many different parcels of land in a variety of ways, and which effects themselves may change over time. That review would have to take place without benefit of the focus that a particular logging proposal could provide. Thus, for example, the court below in evaluating the Sierra Club's claims had to focus upon whether the Plan as a whole was "improperly skewed," rather than focus upon whether the decision to allow clearcutting on a particular site was improper, say, because the site was better suited to another use or logging there would cumulatively result in too many trees being cut. See 105 F. 3d, at 250–251. And, of course, depending upon the agency's future actions to revise the Plan or modify the expected methods of implementation, review now may turn out to have been unnecessary. See *Standard Oil Co., supra,* at 242.

This type of review threatens the kind of "abstract disagreements over administrative policies," *Abbott Laboratories,* 387 U. S., at 148, that the ripeness doctrine seeks to avoid. In this case, for example, the Court of Appeals panel disagreed about whether or not the Forest Service suffered from a kind of general "bias" in favor of timber production and clearcutting. Review where the consequences had been "reduced to more manageable proportions," and where the

"factual components [were] fleshed out, by some concrete action" might have led the panel majority either to demonstrate that bias and its consequences through record citation (which it did not do) or to abandon the claim. *National Wildlife Federation, supra,* at 891. All this is to say that further factual development would "significantly advance our ability to deal with the legal issues presented" and would "aid us in their resolution." *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.,* 438 U. S. 59, 82 (1978).

Finally, Congress has not provided for preimplementation judicial review of forest plans. Those plans are tools for agency planning and management. The Plan is consequently unlike agency rules that Congress has specifically instructed the courts to review "pre-enforcement." Cf. *National Wildlife Federation, supra,* at 891; 15 U. S. C. § 2618 (Toxic Substances Control Act) (providing preenforcement review of agency action); 30 U. S. C. § 1276(a) (Surface Mining Control and Reclamation Act of 1977) (same); 42 U. S. C. § 6976 (Resource Conservation and Recovery Act of 1976) (same); § 7607(b) (Clean Air Act) (same); 43 U. S. C. § 1349(c)(3) (Outer Continental Shelf Lands Act); *Harrison* v. *PPG Industries, Inc.,* 446 U. S. 578, 592–593 (1980). Nor does the Plan, which through standards guides future use of forests, resemble an environmental impact statement prepared pursuant to NEPA. That is because in this respect NEPA, unlike the NFMA, simply guarantees a particular procedure, not a particular result. Compare 16 U. S. C. § 1604(e) (requiring that forest plans provide for multiple coordinated *use* of forests, including timber and wilderness) with 42 U. S. C. § 4332 (requiring that agencies prepare environmental impact statements where major agency action would significantly affect the environment). Hence a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper.

## III

The Sierra Club makes one further important contrary argument. It says that the Plan will hurt it in many ways that we have not yet mentioned. Specifically, the Sierra Club says that the Plan will permit "many intrusive activities, such as opening trails to motorcycles or using heavy machinery," which "will go forward without any additional consideration of their impact on wilderness recreation." Brief for Respondents 34. At the same time, in areas designated for logging, "affirmative measures to promote undisturbed backcountry recreation, such as closing roads and building additional hiking trails," will not take place. *Ibid.* These are harms, says the Sierra Club, that will not take place at a distant future time. Rather, they will take place now.

This argument suffers from the legally fatal problem that it makes its first appearance here in this Court in the briefs on the merits. The Complaint, fairly read, does not include such claims. Instead, it focuses on the amount and method of timber harvesting. The Sierra Club has not referred us to any other court documents in which it protests the Plan's approval of motorcycles or machinery, the Plan's failure to close roads or to provide for the building of trails, or other disruptions that the Plan might cause those who use the forest for hiking. As far as we can tell, prior to the argument on the merits here, the harm to which the Sierra Club objected consisted of too much, and the wrong kind of, logging.

The matter is significant because the Government concedes that if the Sierra Club had previously raised these other kinds of harm, the ripeness analysis in this case with respect to those provisions of the Plan that produce the harm would be significantly different. The Government's brief in the Court of Appeals said:

"If, for example, a plan incorporated a final decision to close a specific area to off-road vehicles, the plan itself

could result in imminent concrete injury to a party with an interest in the use of off-road vehicles in that area." Brief for Federal Appellees in No. 94–3407 (CA6), p. 20.

And, at oral argument, the Solicitor General agreed that if the Sierra Club's claim was that the "plan was allowing motorcycles into a bird-watching area or something [like that], that would be immediately justiciable." Tr. of Oral Arg. 5. Thus, we believe these other claims that the Sierra Club now raises are not fairly presented here, and we cannot consider them.

## IV

For these reasons, we find the respondents' suit not ripe for review. We vacate the judgment of the Court of Appeals, and we remand this case with instructions to dismiss.

*It is so ordered.*