### In re INDIAN MOTORCYCLE LITIGATION.

### No. CIV.A. 02–11522–REK.

United States District Court, D. Massachusetts.

Jan. 30, 2004.

John M. Tanner, Denver, CO, for Plaintiff.

Paul D. Moore, Duane Morris LLP, Boston, MA, Todd P. Blakely, Sheridan, Ross, PC, Denver, CO, Kurt W. Hague, Richard W. Renehan, Rudolph F. Pierce, Goulston & Storrs, PC, Boston, MA, for Defendant.

Michael Mandelman, Milwaukee, WI, pro se.

Noreene Stehlik, Peter Sklarew, Thomas P. Cole, Department of Justice, Washington, DC, Richard T. King, Office of the U.S. Trustee, Worcester, MA, for Claimant.

### Practice and Procedure Order No. 10 All Cases

KEETON, Senior District Judge.

The next case management conference is set for **March 31, 2004, at 9:30 a.m.**

*Practice and Procedure Order No. 10 supplements and does not supercede Practice and Procedure Orders Nos. 1–9.*

### I. Pending Matters

Pending before the court are the following motions and related filings:

(1) Michael Mandelman's Motion for Award of Attorneys' Fees, Costs and Expenses (Docket No. 197) and Affidavit in Support (Docket No. 198) (filed November 5, 2003), refiled with appropriate captions (Docket No. 202 and 203, filed November 13, 2003);

(2) Receiver's Response to Michael Mandelman's Motion for Award of Attorneys' Fees, Costs and Expenses (Docket No. 212, filed November 21, 2003);

(3) Michael Mandelman's Supplemental Memorandum in Support of Motion for Award of Attorneys' Fees, Costs and Expenses (Docket No. 221) and Supplemental Affidavit in Support (Docket No. 222) (filed January 5, 2004);

(4) Receiver's Brief in Response to Michael Mandelman's Claim for Attorneys' Fees, Costs and Expenses (Docket No. 220, filed January 5, 2004);

(5) Michael Mandelman's Reply Memorandum in Support of Motion for Award of Attorneys' Fees, Costs and Expenses (Docket No. 227, filed January 20, 2004);

(6) Receiver's Response to Briefing by Michael Mandelman (Docket No. 228, filed January 20, 2004);

(7) United States' Motion to Finally Set Amount of IMMI's Tax for Year Ended 9/30/99, Including By Determining That, as a Matter of Law, No. Loss Carrybacks Are Allowable (Docket No. 208) and accompanying Memorandum (Docket No. 209) (filed November 19, 2003);

(8) Receiver's Response to IRS' Motion for Advisory Opinion on Summary Procedures Regarding Tax Carry Backs (Docket No. 219, filed January 5, 2004);

(9) United States' Reply to Receiver's Mis-titled Response to United States' Motion to Finally Set IMMI's Tax for Periods Ended in 1999, Including Determination That No Loss Carrybacks Are Allowable (Docket No. 225, filed January 16, 2004) and Correction (Docket No. 229, filed January 28, 2004);

(10) Motion By United States For Partial Summary Judgment on Substantial

Understatement Penalty And For An Order Permitting Discovery on Triable Issue of Fact Regarding Receiver's Affirmative Defense (Docket No. 210) and accompanying Memorandum (Docket No. 211) (filed November 26, 2003);

(11) Receiver's Response to IRS' Motion for Discovery (Docket No. 218, filed January 5, 2004); and

(12) Reply to Receiver's Response to U.S. Motion for Partial Summary Judgment On Penalty and for Discovery on Triable Issue of Fact Regarding Receiver's Affirmative Defense (Docket No. 226, filed January 16, 2004).

## II. Motion for Attorneys' Fees

### A. Background

This Motion for Attorneys' Fees arises out of the Receiver's previous motion for rescission or reformation of his settlement agreement with Michael Mandelman. The factual background underlying the Receiver's claim is recited in Practice and Procedure Order No. 6 (Docket No. 161) at 6–11, *In re the Receivership Estate of Indian Motorcycle Manufacturing, Inc.*, 299 B.R. 36, 41–44 (D.Mass.2003).

For the purposes of the disposition of this matter, the following summary is sufficient. Before 1995, the Receiver and Michael Mandelman were embroiled in a trademark dispute. In 1995, the parties entered into a settlement agreement. *See* Ex. A to Docket No. 221 (the "1995 agreement"). Under the terms of the agreement, the Receiver was to purchase all stock of the companies involved in the trademark dispute from Mandelman. The purchase price was $50,000 in cash and a promissory note for $800,000 in favor of Mandelman. The Receiver was to issue stock representing 10% of the company placed into receivership, Indian Motorcycle Manufacturing, Inc. ("IMMI") to Indian Distributors Pty., Ltd. ("Distributors"), an Australian corporation wholly owned by Mandelman. Mandelman and the Receiver were to jointly establish a separate corporation for the purpose of holding all of the European trademark rights.

By 1997, further disputes had arisen. The parties resolved these disputes by entering into an agreement in open court, at a hearing before Magistrate Judge Schlatter. *See* Transcript of 11/24/97 Hearing (Ex. D to Docket No. 221) at 18–21. The 1997 agreement does not refer to the 1995 agreement. Some of the terms of the latter agreement are inconsistent with the terms of the 1995 agreement. In particular, the 1997 agreement stated: "Michael D. Mandelman shall receive 3 percent of the shares of the U.S. corporation, shall receive no interest in the European corporation or corporations formed or to be formed, shall receive $2 million in a cash payment at the final closing on the sale of Indian to its purchaser." *Id.* at 19. The parties now dispute whether the 1997 agreement was a new agreement, entirely superceding the previous agreement, or whether it was, instead, a modification of one or more terms of the 1995 agreement, leaving the other terms of the 1995 agreement in place.

The Receiver previously alleged that part of the consideration for the 1995 agreement was a judgment worth $881,412.50 (the "Zanghi judgment"). The judgment, however, had been satisfied before 1995, and was no longer collectible when the 1995 agreement was signed. The Receiver argued that this constituted fraud, and moved that the contract be reformed. I ruled, however, that the Receiver had not alleged fraud with the specificity required under Fed.R.Civ.P. 9(b), and denied the Receiver's motion.

### B. The 1997 Agreement Did Not Supercede the 1997 Agreement

Mandelman now claims that the Receiver's efforts to have this court reform

the agreement constitute "litigation concerning this Agreement," and moves for attorneys' fees. The 1995 agreement contained the following clause:

In the event of litigation concerning this Agreement the prevailing party shall be entitled to recover against the other party its reasonable attorneys' fees, costs and expenses incurred in enforcing its rights hereunder.

1995 Agreement at ¶ 39. The Receiver argues, first, that the 1997 agreement—which contains no such provision—was a new agreement, fully superceding the 1995 agreement, thereby nullifying the 1995 attorneys' fees provision. Second, the Receiver contends that Mandelman committed material breaches of the 1995 agreement, with the consequence that the Receiver no longer had any obligation under the 1995 agreement—including under the attorneys' fees provision.

I conclude that the evidence suggests that the parties viewed the 1997 agreement as a modification of the 1995 agreement, and not as an entirely separate agreement. I also conclude that the Receiver has placed insufficient evidence in the record to support a finding that Mandelman committed any material breach of the 1995 agreement. Although I rule that the receivership owes Mandelman's attorneys' fees, I explain, below, that this ruling does not constitute a separate and final judgment. Mandelman's claim for attorneys' fees will not be collectible until further order of this court.

A careful reading of the transcript leads to the firm conclusion that the parties intended to modify, and not supercede, the 1995 agreement. First, the 1997 agreement does not contain all the terms that one would expect to find in a fully integrated agreement. It does not contain, for instance, (i) a term concerning which court is to have venue and jurisdiction over dis-putes, (ii) a term binding the parties' successors in interest, (iii) a severability clause, or (iv) a provision regarding the service of notices required under the agreement. Each of these terms is included in the 1995 agreement. It is highly improbable that the parties intended to eliminate these terms from the agreement that survived without any mention of that intent in the latter agreement. Indeed, even the Receiver, in other filings, has referred to the 1997 agreement as an amendment of the 1995 agreement. *See, e.g.,* Receiver's Motion Based Upon Fraud or Fraudulent Inducement for Reformation of Contract With Michael Mandelman and Partial Restitution of Consideration Paid to Mr. Mandelman (Ex. E. to Docket No. 221, filed in No. 95–Z–777, D. Colo., September 25, 2001) at ¶ 8 ("Mr. Mandelman and the Receiver agreed to amend the Mandelman agreement. . . .").

The Receiver alleges that judicial estoppel precludes Mandelman from arguing that the 1997 agreement was merely an amendment of the 1995 agreement. The Receiver asserts that Mandelman has repeatedly referred to the 1997 agreement as a "new deal." Nowhere, however, does the Receiver point to Mandelman's use of that phrase. The Receiver does quote Mandelman as characterizing the 1997 agreement as a "definitive agreement." But that phrase does not imply that it is an *exclusive* agreement, or that it supercedes the 1995 agreement.

A careful reading of the transcript of the hearing before Magistrate Judge Schlatter leads me to the firm conclusion that the parties manifested the intent to leave the provisions of the 1995 agreement in place, to the extent that they were not contradicted by the 1997 agreement. In these circumstances, I rule that, subject to the Receiver's material breach defense (addressed below), the provision in the 1995

agreement awarding attorneys' fees remained effective.

### C. Insufficient Evidence Exists to Support a Finding of Material Breach

■ The Receiver also argues that Mandelman has committed a material breach of the 1995 agreement, thereby relieving him of any obligation under the contract. The Receiver first points to his allegation that Mandelman failed to deliver a promised asset, i.e., the Zanghi judgment. I addressed this argument in Practice and Procedure Order 6. *See* PPO 6 at 12–17, 299 B.R. at 44–47. The Receiver now further argues that paragraph 19 of the 1995 agreement, which sets forth that the Receiver was to pay $50,000 for Mandelman's stock provides evidence that any additional money paid by the Receiver must have been earmarked for other consideration—namely the Zanghi judgment. This argument—which requires that I look beyond the four corners of the contract to find additional terms—is barred by the Statute of Frauds. As I explained in PPO 6:

> The Statute of Frauds prohibits an action on a contract for the sale of personal property worth more than $5,000 without a writing signed by the party against whom the contract is to be enforced. *See* Mass. Gen. Laws ch. 106, § 1–206; Colo.Rev.Stat. § 4–1–206. In this case, the Receiver has admitted that the Original Mandelman Agreement contains no mention of the judgment. . . .

The Receiver contends that the Statute of Frauds does not necessarily bar his claim because partial performance can satisfy the Statute of Frauds. Docket No. 148 at 10 (citing *Nelson v. Elway*, 908 P.2d 102 (Colo.1995)). The case upon which the Receiver relies explains the rule as follows:

> The part performance doctrine will apply if there is part performance of an oral contract which is: (1) substantial; and (2) required by, and fairly referable to no other theory besides that allegedly contained within the oral agreement. . . . This rule is based on the premise that the conduct constituting the partial performance must convincingly evidence the existence of the oral agreement.

*Nelson v. Elway*, 908 P.2d 102, 108–109 (Colo.1995) (citations omitted).

The Receiver does not specify what "partial performance" removes the fraud claim from the Statute of Frauds, but a reasonable inference is that the Receiver refers to the performance of the Agreement with Mandelman. This conduct cannot constitute partial [performance] because it is simply performance of the contract as memorialized in signed writings; it is not performance that can be explained only by the alleged transfer of the judgment to the Receiver. The partial performance exception cannot mean that parties are free to proceed with claims alleging the existence of additional, unwritten terms to a contract whenever a signed contract has been partially performed.

PPO 6 at 20–21, 299 B.R. at 48–49. I conclude that the Statute of Frauds precludes the Receiver from introducing evidence to show that the Zanghi judgment was part of the consideration for the 1995 agreement.

■ The Receiver also argues that Mandelman has committed a material breach of the contract through the following course of conduct:

> As part of [the 1995 agreement], Mr. Mandelman was put on the receiver's Finance Committee in 1995 and was supposed to work closely with the receiver to maximize the value of the Re-

ceivership property. In 1997 the receiver learned that Mr. Mandelman had created his own, competing Indian Motorcycle Company and was in fact preparing to compete with the receiver and the receiver's contract purchaser.

Receiver's Response to Michael Mandelman's Motion for Award of Attorneys' Fees, Costs and Expenses (Docket No. 212 (first response)) at 2–3. The Receiver is correct that the 1995 agreement places Mandelman on the Receiver's Finance Committee. *See* 1995 Agreement at ¶ 37. The agreement does not, however, impose any duty of non-competition on Mandelman. The Receiver has, therefore, not made out a prima facie case of breach of contract. Moreover, the Receiver has not directed my attention to any part of the record that supports the Receiver's allegations of Mandelman's course of conduct. In these circumstances, I conclude that the record does not support the Receiver's assertion that Mandelman has committed a material breach of the 1995 agreement.

### D. The Receiver's Unclean Hands Argument Fails for Similar Reasons

The Receiver also argues that, under equitable principles, the attorneys' fee provision should not be enforced because Mandelman has unclean hands. The facts underlying the Receiver's unclean hands arguments are the same as those upon which its material breach argument was founded. As with the material breach argument, the Receiver has not cited to any portion of the record to substantiate his assertion that Mandelman has acted inequitably. Since, in its two briefs in opposition to Mandelman's motion for attorneys' fees (Docket Nos. 212 and 220), the Receiver has failed to identify specific evidence supporting its claim that Mandelman has acted inequitably, I rule that the Receiver's contention is without merit.

In these circumstances, I rule that, under the terms of the contract, which I must enforce, the Receiver has an obligation to pay Mandelman's attorneys' fees related to Mandelman's defense of his rights under the 1995 agreement.

### E. Discovery Motion is Moot

The Receiver also requests, in Docket No. 220, discovery to ascertain the reasonableness of Mandelman's bill. As grounds, the Receiver states that Mandelman did not adequately support his application for fees with contemporaneous records detailing the type of work performed.

Mandelman filed a Supplemental Affidavit (Docket No. 222, filed January 5, 2004), after the Receiver's brief, with extensive details to support his fee application. In these circumstances, the Receiver's request for discovery is moot.

### F. Mandelman's Requested Fees Are Generally Reasonable

The Receiver objects to Mandelman's attorneys' fees on four grounds. First, it objects to the recovery of any fees charged by Mandelman's previous attorneys. But Mandelman does not request reimbursement for fees charged by attorneys other than his current counsel. This objection, therefore, is not on point and is moot.

The Receiver next argues that, because Mandelman allegedly prevailed on only one motion, the motion to dismiss, he should recover only for time spent preparing that motion. This argument clearly lacks merit. The Agreement provides that the prevailing party in litigation concerning the Agreement is to recover its costs associated with protecting its rights. Mandelman's entire involvement in this aspect of ongoing proceedings is aimed at protecting his rights under the Agreement. As he has prevailed to the extent explained in this Memorandum, he is entitled to re-

cover all of his costs. His alleged lack of success in intermediate stages is irrelevant under the terms of the Agreement.

■ The Receiver also objects that Mandelman's attorneys billed for time to learn about the case and about receiverships in general. The Receiver states that Mandelman could have avoided these charges by retaining his previous law firm. This argument might have merit if Mandelman were requesting reimbursement for the attorneys' fees charged by his previous firm, since, in that circumstance, the charges would represent duplicative work performed by the two firms. It is not, however, unreasonable to charge the Receiver for a single firm to perform the background research necessary to litigate this claim effectively.

■ Finally, the Receiver objects to the recovery of time for settlement discussions, stating that the settlement discussions took place in the First Circuit, where Mandelman is not a party. The Receiver apparently refers to the First Circuit's Civil Appeals Management Program ("CAMP"), a mediation service provided for all appeals in the First Circuit. But whether or not Mandelman was a formal party in a First Circuit proceeding, the evidence before me demonstrates that he in fact participated in settlement negotiations. I rule that, under the terms of the 1995 Agreement, Mandelman's time spent in those negotiations is compensable under the terms of the 1995 Agreement.

I have reviewed Mandelman's attorneys' fees, as set out in exhibit A to Docket No. 222. I conclude that the charges are reasonable, with a single exception. On July 10, 2003, a charge exists on behalf of Adam N. Cederbaum. The charge is for one hour of time, and reads, "Sitting in on conference call w/judge and in Kurt's office while on phone w/DOJ." I rule that this does not represent a reasonable expense

that falls within the terms of the Agreement. The record before me does not state precisely what the charge was for this one hour of time. Evidence does exist, however, showing that an associate with four years' experience billed $280, while a paralegal billed $120. I conclude that it is appropriate to reduce the compensation Mandelman is entitled to collect by $150, representing the approximate charge for this hour.

In these circumstances, I rule that the receivership owes Mandelman $91,762.22 in attorneys' fees, costs, and expenses.

*G. Mandelman Does Not Have Priority*

No liquid funds exist in the receivership to pay Mandelman's attorneys' fees. Mandelman suggests that the Receiver should be ordered to disgorge some of the fees it has collected on behalf of itself and its counsel. Mandelman suggests that his claim to the receivership funds is at least equal in priority to the claims of the Receiver. He argues that he and the Receiver should share fees on a pro rata basis.

■ The preeminent treatise on receivers states as follows:

The order of payment of receivership costs and expenses may be stated as follows: —

First: Payment of what is ordinary called court costs and payment of receiver's fees and receiver's counsel fees....

Second: There may be various expenses of preservation and operation of the property.... Included in this second division may be receiver's certificates which may have been issued to pay expenses of operating the property....

Third: There are charges against the receivership which are not court costs, receiver's fees or receiver's counsel fees but are charges of realization... The costs of realization include collecting

property and debts belonging to the defendant debtor and frequently the costs of sale of some or all of the property. 2 Ralph Ewing Clark, *A Treatise on the Law and Practice of Receivers* § 637 (3rd ed.1959) (hereinafter *Clark on Receivers* ). The amounts owed to Mandelman clearly do not fall in the first category, but the Receiver's fees on behalf of itself and its attorneys do. Under this formulation, then, the Receiver is entitled to first priority to the funds in the receivership to cover its fees and those of its counsel.

■ Finally, in a receivership proceeding of this nature, this court sits in equity, and the allocation of priority lies within the trial court's sound discretion. *See, e.g., Antoine v. James E. Nelson,* 265 Mass. 214, 218, 163 N.E. 903 (1928). In pursuing its motion based on fraud, the Receiver was zealously obeying its duty to preserve and protect the receivership assets. The Receiver is not to be punished for this conduct. I rule that equity requires Mandelman's claim against the receivership to be subordinated to the claims of the receiver and his counsel.

Because the receivership is now illiquid, the Order below declares that the receivership estate owes Mandelman $91,762.22 in attorneys' fees, but that this amount may not be collected until further order of this court.

### III. Motion to Set Tax Amount and to Disallow Carrybacks

The United States moves to set IMMI's tax for the year ending September 30, 1999, at $1,065,270, plus $358,351.84 in interest through September 30, 2003. The United States first proposed this number in its filing of July 28, 2003 (Docket No. 158). In PPO 6, I deferred ruling on this calculation because the Receiver had not yet had an opportunity to respond. *See* PPO 6 at 26, 299 B.R. at 52. In Docket No. 180, the Receiver's response to PPO 6,

the Receiver did not dispute the principal amount. It did dispute the right of the United States to charge interest on the principal, but it provided these arguments only "[a]s a preview of the pleading to be filed" in the event the United States filed a formal motion for interest. Docket No. 180 at 13.

The United States did file such a motion, in Docket No. 208. The Receiver's response to this motion does not address either the principal or the interest amount. In these circumstances, I conclude that the Receiver has declined to oppose the principal and interest calculation.

After have reviewed the United States' calculations, I conclude that they are correct. The Order below includes a declaration that the IMMI's tax for the tax year ending September 30, 1999 is $1,065,270, plus $358,351.84 in interest through September 30, 2003, subject to modification if the Receiver files later tax returns affecting this amount.

■ The United States also asks me to rule that the Receiver may not now file tax returns for later tax years that attempt to carry back losses to tax year 1999. If the Receiver is successful in carrying back losses, the tax liability recited above will be substantially reduced. The Receiver argues that any order disallowing carryback losses would constitute an impermissible advisory opinion, since the later tax returns in question have not yet been filed. I conclude that it would be inappropriate to enter an order such as that requested by the United States because the issue is not ripe.

■ The doctrine of ripeness combines constitutional considerations— whether a given dispute qualifies as a "case or controversy" within the meaning of Article III of the Constitution—with

prudential considerations. *Doe v. Bush,* 323 F.3d 133, 138 (1st Cir.2003). One rationale underlying the doctrine is "the recognition that, by waiting until a case is fully developed before deciding it, courts benefit from a focus sharpened by particular facts." *Id.* at 138 (*citing Ohio Forestry Ass'n v. Sierra Club,* 523 U.S. 726, 736, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998)). Here, full development of the facts—i.e., the submission of the actual tax returns in question—would benefit this court by sharpening the issues in dispute.

 The ripeness determination is made by reference to a two-prong test. A court must evaluate "[1] the fitness of the issues for judicial decision and [2] the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (numeration added). I rule that neither prong supports a determination of ripeness here.

First, this issue is unfit for judicial decision because of the undeveloped factual record. To adjudicate this dispute, I would be required to rule on a series of hypotheticals, deciding whether a given tax treatment would be permissible without knowing whether the Receiver intends, in fact, to claim such a treatment. Without the actual disputed facts in the record, judicial resources would be needlessly expended determining the appropriateness of tax claims that are, in the end, undisputed; and my disposition of disputed claims would be uninformed by nuances that the tax returns themselves would expose.

The impact of the undeveloped nature of the record is heightened by the lack of substantive response on the part of the Receiver. The reliability of judicial decisionmaking is at its peak, in an adversary system, where all facts are before the court and the court has the benefit of strong arguments on both sides of an is-sue. Here, the receiver has not briefed the issue of loss carrybacks, relying instead on its assertion that a decision on this issue would represent an advisory opinion. Ordinarily, a party's failure to brief an issue should not be rewarded. But in this case, the Government asks me to rely on its argument that *no possible* loss carryback exists, in any possible filed tax return. But I cannot predict all of the legal twists that may be presented by a given tax return. I cannot even evaluate the Government's contention against the opposing party's arguments, as the Receiver has made no relevant arguments. Because of the undeveloped state of the record, I conclude that this issue is particularly unfit for judicial resolution.

Second, the hardship to the parties of a determination of unripeness is relatively minimal. The primary hardship is the delay inherent in the Receiver's preparation of its tax returns, including the possibility of dilatory behavior on the part of the Receiver. If this hardship were inevitable, it would weigh heavily in favor of a finding of ripeness. This result may, however, be avoided. The Receiver is an arm of the court, and I may issue instructions to it. *See* 1 *Clark on Receivers* § 11(b). I may, for example, instruct the receiver to file any tax returns claiming a loss carryback within a predetermined amount of time. Since the hardship of which the United States complains is avoidable, I rule that this prong of the ripeness test is not determinative.

On balance, I rule that the dispute over unfiled tax returns is not yet ripe.

The United States refers, in its briefs, to the possibility that the Receiver will draw out these proceedings by strategically timing its filing of later years' tax returns. In light of my ruling, above, the United States may move for an appropriate in-

struction directed toward the Receiver to obviate this possibility.

## IV. Motion Regarding Underpayment Penalty

 The United States moves for partial summary judgment on the 20% understatement penalty the IRS imposed on IMMI's income tax for the year ending September 30, 1999 under I.R.C. § 6662, except to the extent that resolution of this dispute turns on the validity of the Receiver's defense under I.R.C. § 6664 of reasonable good-faith reliance on expert advice. The United States admits that resolution of this defense presents a material issue of fact, and requests discovery limited to this issue.

In its response, the Receiver does not address the Government's penalty argument. After reviewing the Government's contentions regarding the understatement penalty, I find them to be meritorious.

I.R.C. § 6662 imposes a 20% penalty where a taxpayer substantially understates his or her tax, except where the taxpayer's proposed treatment was supported by substantial authority. *See* I.R.C. § 6662(d)(2)(B)(i). The IRS disallowed four deductions, and I upheld the IRS's disposition. *See* Practice and Procedure Order No. 5 (Docket No. 133) ("PPO 5") at 27–40, 299 B.R. 8, 25–32 (D.Mass.2003). Upon reviewing the record, and in light of the United States' arguments, and the Receiver's lack of a response, I rule: 1) no substantial authority existed for the Receiver's deduction of the Motor Claims Expense, *see* PPO 5 at 27–31, 299 B.R. at 25–28; 2) no substantial authority existed for the Receiver's deduction of the Certificate Holders' Stock Expense, *see* PPO 5 at 31–36, 299 B.R. at 28–30; 3) no substantial authority existed for the Receiver's deduction of the Mandelman/Lean stock expenses, *see* PPO 5 at 36–38, 299 B.R. at 30–31; and 4) no substantial authority existed for the Receiver's deduction of the Finance Committee Members' Stock Expense, *see* PPO 5 at 38–40, 299 B.R. at 31–32. In these circumstances, I conclude that, subject to the Receiver's affirmative defense of reliance on a certified public accountant, the substantial underpayment penalty is warranted.

The United States argues that it requires discovery in order to prepare for a trial on the issue of whether the Receiver relied on the advice of a certified public accountant. The United States represents that it "wishes to subpoena documents from the accountant and then depose him, and also seeks to depose [Richard] Block[, President of the Receiver]. Both depositions would presumably occur in Colorado where the deponents reside." Docket No. 226 at 3.

The Receiver opposes discovery on two grounds. First, it argues that the request is "nothing short of calling the receiver a liar," Docket No. 219 at 1, since Mr. Block has sworn under penalty of perjury that certified public accountants advised him that no taxes were due. The United States, however, is entitled to question the integrity of an adverse party—and although the Receiver is sometimes viewed as an arm of the court, in these circumstances its interests are clearly adverse to those of the United States.

The Receiver also avers that "the rule in this case since its transfer here from Colorado has been no discovery." Docket No. 219 at 1. On the contrary, no such rule exists. To the extent I have denied the Receiver permission to engage in discovery, my rulings have been based on issue-specific factors inapplicable to the present dispute. Because the resolution of whether the affirmative defense under § 6664 is applicable will require the resolution of disputed facts, I rule that the United

States is entitled to extremely narrowly-tailored discovery, as described below.

 The Receiver contends that the Receiver and its counsel will be required to expend significant time responding to the United States's discovery requests. The Receiver requests that the United States be required to compensate the Receiver for its fees incurred in complying with discovery. A trial court, indeed, has broad discretion to reallocate expenses in connection with discovery. *See Navarro de Cosme v. Hospital Pavia,* 922 F.2d 926, 930 (1st Cir.1991). In view of the length of time during which the Receiver has operated without compensation and the illiquid nature of the receivership estate, I conclude that narrow tailoring of the discovery available to the United States, combined with some cost reallocation, may be appropriate.

In these circumstances, I rule that the United States is entitled to discovery, consisting solely of a subpoena duces tecum directed to the accountant who allegedly provided advice to the Receiver that no tax was due; a deposition of that accountant; and a deposition of the Receiver. The reasonable expenses for the costs and professional fees incurred in complying with the United States's discovery requests will initially be borne by the Receiver. In the event, however, that the discovery requests prove unduly burdensome, the Receiver's counsel is instructed that he may renew his motion to recover the costs, fees, and expenses associated with complying with the subpoena and deposition. In ruling on that motion, I expect to take into consideration the reasonableness of the positions taken by both sides in light of the evidence uncovered by discovery, as well as the reasonableness of the fees and expenses. In the event of such a motion, therefore, the parties may be required to submit full accounts of the results of dis-

covery, and the Receiver may be required to submit a detailed account of the basis for its fee request.

## V. Recoupment

In conjunction with its opposition to Mandelman's motion for attorneys' fees, the Receiver asks this court to begin a recoupment process. Much confusion has arisen over the issue of recoupment. I take this opportunity to clarify. Both the United States and the Receiver have indicated a desire to disgorge some payments previously made to claimants in order to satisfy federal tax debts and professional fees of the Receiver, respectively. The Receiver, however, appears to have perceived developments in this case as hampering its attempts to pursue recoupment. *See, e.g.,* Docket No. 25; Docket No. 122; Docket No. 124; Docket No. 162. Instructions appear to be necessary in order to move this case closer to resolution.

 While recoupment may be appropriate in this case, I cannot, consistent with due process, order recoupment without giving notice and an opportunity to be heard to those who would be affected by such an order. *See* PPO 6 at 23–24; 299 B.R. at 50. In these circumstances, any party desiring to recoup funds paid out of the receivership must provide notice to those entities in possession of such funds of its intent to do so. To the extent the list of entities to be noticed is under the control of the Receiver, the court instructs the Receiver to release that list to the United States and to Mandelman.

## ORDER

For the foregoing reasons, it is hereby ORDERED:

(1) Michael Mandelman's Motion for Award of Attorneys' Fees, Costs and Expenses (Docket No. 197) has been WITH-

DRAWN and is superceded by Docket No. 202.

(2) Michael Mandelman's Motion for Award of Attorneys' Fees, Costs and Expenses (Docket No. 202) is ALLOWED to the following extent: It is ORDERED that the Receivership owes Mandelman $91,762.22 in reasonable attorneys' fees, costs, and expenses. Mandelman is precluded from collecting this amount until further order of this court. The Motion contained in Docket No. 202 is DENIED in all other respects.

(3) United States' Motion to Finally Set Amount of IMMI's Tax for Year Ended 9/30/99, Including By Determining That, as a Matter of Law, No. Loss Carrybacks Are Allowable (Docket No. 208) is ALLOWED to the following extent: It is ORDERED that IMMI's tax for the tax year ending September 30, 1999 is $1,065,270, plus $358,351.84 in interest through September 30, 2003. This amount may be modified if the Receiver later files tax returns that affect the Receiver's tax liability for the year ending September 30, 1999. The Motion contained in Docket No. 208 is DENIED in all other respects.

(4) Motion By United States For Partial Summary Judgment on Substantial Understatement Penalty And For An Order Permitting Discovery on Triable Issue of Fact Regarding Receiver's Affirmative Defense (Docket No. 210) is ALLOWED to the following extent: It is ORDERED that the United States is entitled to collect a substantial understatement penalty with respect to IMMI's fiscal year ending September 30, 1999, as provided by I.R.C. § 6662. The United States is entitled to discovery with respect to the Receiver's affirmative defense of reasonable reliance on tax advice under I.R.C. § 6664, to the extent detailed in the foregoing Memorandum.

(5) The Receiver is instructed to release any list of entities to whom receivership funds have been disbursed to any party in this action upon request, to the extent such information is within the possession of the Receiver.