# United States Court of Appeals
## For the Eighth Circuit

———————————

No. 16-1952

———————————

Ouachita Watch League; Newton County Wildlife Association; Shawn Porter; G. Thomas McKinney; David Reagan; Susan Gateley; Robert B. Leflar; Sarah May Leflar; Kimberly Ison; John Ison; Billy Lindsey; Carol Lindsey; James Mitchell; Ruth Mitchell; John Lawrence Poff

*Plaintiffs*

Ozark Society

*Plaintiff - Appellant*

v.

United States Forest Service; Judith L. Henry, Forest Supervisor, Ozark-St. Francis National Forests; Department of Agriculture; Department of Interior, Bureau of Land Management; Department of Defense, United States Army Corps of Engineers, Little Rock District; United States Department of the Army; Bureau of Land Management; Dr. John Lyon, in his official capacity of Eastern States Director, Bureau of Land Management; Bruce Dawson, in his official capacity as Eastern States Field Manager, Bureau of Land Management

*Defendants - Appellees*

————————

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

————————

Submitted: January 11, 2017
Filed: May 30, 2017

————————

Before SMITH[1] and KELLY, Circuit Judges, and SIPPEL, District Judge.[2]

_____

SMITH, Circuit Judge.

The United States Forest Service ("Forest Service") developed a management plan for the Ozark–St. Francis National Forests and analyzed the plan's environmental effects in 2005. At that time, the Forest Service anticipated 10–20 new natural-gas wells within ten years. That expectation arose from projections about natural-gas development in north central Arkansas's Fayetteville Shale Play. The projection missed the mark. Three years later, the Forest Service discovered that the better prediction was not 10–20 new wells, but 1,730. It nevertheless concluded, after consulting various experts, that this 85-fold increase in predicted drilling did not require a "correction, supplement, or revision" to the original environmental analysis. The Ozark Society ("the Society") challenges this conclusion, contending that the Forest Service did not look hard enough at the environmental effects of drilling 1,730 wells versus 10–20. Because the Society has not identified any particular member who stands to be harmed by the government action it challenges, it lacks a concrete interest in this dispute, and we must dismiss for lack of jurisdiction.

## I. *Background*

The National Forest Management Act of 1976 requires the Secretary of Agriculture to develop "land and resource management plans" for each national forest. 16 U.S.C. § 1604(a); *see also Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 728–29 (1998). This duty devolves to the Forest Service, which manages

_____

[1]The Honorable Lavenski R. Smith became Chief Judge of the United States Court of Appeals for the Eighth Circuit on March 11, 2017.

[2] The Honorable Rodney W. Sippel, Chief Judge, United States District Court for the Eastern District of Missouri, sitting by designation.

the national-forest system. *Ohio Forestry Ass'n*, 523 U.S. at 729. Another act, the National Environmental Policy Act, requires that "major Federal actions significantly affecting the quality of the human environment"—such as the development of a land and resource management plan—be accompanied by an environmental impact statement. 42 U.S.C. § 4332(2)(C)(i). An agency must supplement an environmental impact statement if there is major federal action yet to occur and it discovers significant new information "relevant to environmental concerns and bearing on the proposed action." 40 C.F.R. § 1502.9(c)(1)(ii); *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 72–73 (2004). The Forest Service policy manual requires it to explain its decision not to supplement an environmental impact statement in a document sometimes called a "Supplemental Information Report" (SIR). Forest Service Handbook 1909.15 § 18.1. This case concerns a 2010 SIR involving the Ozark–St. Francis National Forests.

The Ozark and St. Francis national forests are two separate national forests—one mostly in northern Arkansas's Ozark Mountains and the other in eastern Arkansas's delta region—that are managed together. The latest management plan for these forests dates from 2005. It took four years to develop. This "major federal action" required an environmental impact statement. That statement, also published in 2005, exceeds 500 pages. It notes 49 active gas wells in the Ozark National Forest and anticipates 10–20 new wells within ten years.

By 2007, discovery of natural gas in north central Arkansas led to a boom in drilling in the Fayetteville Shale. *See* Thomas A. Daily & W. Christopher Barrier, *Well, Now, Ain't That Just Fugacious!: A Basic Primer on Arkansas Oil and Gas Law*, 29 U. Ark. Little Rock L. Rev. 211, 211 (2007). That year, the Forest Service asked the Bureau of Land Management to make an updated prediction about future gas development in the Ozark National Forest. In 2008, the Bureau came back with a number more than 85-times higher than the Forest Service's original prediction: 1,730 new wells. The Forest Service talked to specialists over the next two years and

in 2010 issued a SIR. It concluded that this dramatic increase in predicted drilling required no "correction, supplement, or revision" to the original environmental impact statement. In effect, the agency concluded that the original statement was still reliable.[3]

The Society sued various federal-agency defendants in October 2011 to challenge the decision embodied in the 2010 SIR.[4] The Society is a nonprofit conservation and recreation group that seeks to protect the natural character of Arkansas's Ozark Mountains, particularly its scenic wilderness. The Society sought a judgment declaring that the 2010 SIR decision was arbitrary and capricious and therefore in violation of the Administrative Procedures Act. It also sought to enjoin further mineral leasing in the Ozark National Forest. The district court held that the Society had standing to sue but denied preliminary injunctive relief. It later granted summary judgment to the federal agencies for four reasons. First, the 2010 SIR was not a final agency action subject to judicial review. Second, the Forest Service was not obligated to supplement the 2005 environmental impact statement. Third, the federal agencies did not have to allow public participation when deciding whether to supplement the environmental impact statement. And fourth, the Society's challenge to one particular drilling permit was moot because the well had already been drilled. The Society appeals.

---

[3]It turns out that the 10–20 well prediction was closer to reality than the later 1,730 well prediction. In 2014, the Forest Service noted that "[f]rom 2006 through 2013 forty one producing natural gas wells, five exploratory wells, and two non producing or dry holes have been developed on the Forest . . . . During the last two years, no natural gas wells have been developed on the Forest."

[4]As defendants, the Society joined the Forest Service, the Bureau of Land Management, the Supervisor of the Ozark–St. Francis National Forests, the Eastern States Director of the Bureau of Land Management, and the Eastern States Field Manager of the Bureau of Land Management.

## II. *Discussion*

First we must address whether the Society has standing to challenge the agency action at issue. Our constitutional responsibility is to "redress or prevent actual or imminently threatened injury," and unless a party has suffered such an injury, we have "no charter to review and revise . . . executive action." *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009). Put another way, we may adjudicate only "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. The doctrine of standing keeps us to this business. It requires, among other things, that the plaintiff have an actual or imminent injury before invoking a federal court's aid. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The injury need not be physical; harm to recreational or esthetic interests may suffice. *Summers*, 555 U.S. at 494. And the injury need not be asserted directly by the injured party; organizations like the Ozark Society may assert the standing of their members. *Id*. But "generalized harm to the forest or the environment will not alone support standing." *Id*.

Having a "specific and concrete plan . . . to enjoy the national forests" distinguishes a particular harm to a recreational interest from mere generalized harm. *Id.* at 495. When the plaintiff is a group, this plan must belong to an identified group member, not merely to the group at large. *Id.* at 498; *see also Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013). The burden of establishing the specific plan of an individual member to enjoy the forest—in other words, the burden to establish standing—rests on the party asking a federal court to adjudicate its dispute. *Lujan*, 504 U.S. at 561.

The district court in this case concluded that the Society's "allegations and the affidavit of Robert Cross . . . adequately set forth alleged concrete and particularized harm which will result from the drilling activities." Paragraph 12 of the Society's complaint describes the organization's background and its relationship with the Ozark National Forest:

The Ozark Society membership utilizes the Ozark National Forest, roadless areas, wilderness areas, and wild and scenic rivers for hiking, boating, and other outdoor recreation activities. The Ozark Society regularly schedules outings in the Ozark National Forest. . . . The Ozark Society has a vested interest in the environmental health of the Ozark National Forest.

Paragraph 80 describes the harm flowing from the defendants' actions:

The defendants have engaged in a course of action which has caused, and will continue to cause, irreparable environmental harm in the Ozark National Forest. This harm causes a direct adverse impact on the Ozark Society's interest. The defendants have also denied the Ozark Society and the public the right to participate in the [National Environmental Policy Act] process for assessing such environmental harm. The defendants' actions have caused harm to the Ozark Society's interest in the management and environmental well-being of the Ozark National Forest, and the Ozark Society's ability to participate in those management decisions.

The other alleged support for standing comes from the declaration of Robert Cross, the Society's President. Cross declared that he has led and participated in hikes in the Ozark National Forest. He also recalled the Society holding a meeting there.

On de novo review, *Jones v. Gale*, 470 F.3d 1261, 1265 (8th Cir. 2006), we conclude that the complaint and declaration do not establish the Society's standing. Paragraph 80 is a series of general and conclusory legal allegations—it provides no facts about how the defendants' actions have harmed or will harm the Society, and it speaks only for the Society as a whole, rather than for an identified member. Paragraph 12 does allege that the Society "regularly schedules outings" in the Ozark National Forest, which might be sufficient to establish a specific plan to use the Forest in the future because it implies an ongoing use. Yet paragraph 12, like paragraph 80, attributes this plan only to the Society generally, rather than to an

identified member. It stands to reason that some of the Society's members share the group's mission but not its use of the Forest. And while it is statistically probable that paragraph 12's language describes at least one particular member, "[t]his requirement of naming the affected members has never been dispensed with in light of statistical probabilities, but only where *all* the members of the organization are affected by the challenged activity." *Summers*, 555 U.S. at 498–99. The Society has not argued that the Forest Service's actions necessarily would affect all its members in a concrete way, and we would have to speculate to conclude as much. The Cross declaration presents the opposite shortcoming: it identifies a particular member with no stated plan to enjoy the Forest in the future. *See id.* at 495.

The Society attempts to distinguish *Summers* by pointing out that the parties there had resolved their dispute about a particular forest project. But *Summers* also noted that the plaintiffs had "identified no other application of the invalidated regulations that threatens imminent and concrete harm to the interests of their members." *Id.* The Court came to this conclusion after considering an affidavit that showed no "specific and concrete plan" by a particular member to enjoy the national forests. *Id.* The Society also notes that the agency action in *Summers* involved agency-wide regulation while this case involves a single agency decision. Assuming this is a distinction, it still does not supply any member of the Society with an interest in the national forests affected by this agency decision.

Nor are we persuaded that this case is like *Pacific Rivers Council v. United States Forest Service*, on which the Society relies. 689 F.3d 1012 (9th Cir. 2012), *vacated as moot*, 133 S. Ct. 2843 (2013). In *Pacific Rivers*, the organization's chairman declared that he lived near and frequented the potentially affected area. *Id.* at 1022. The Ninth Circuit concluded that the chairman had "clearly stated that he and a number of Pacific Rivers' members have used, and will continue to use, the national forests in the Sierras in a variety of places and in a variety of ways." *Id.* The Society, on the other hand, has alleged only that as a group it regularly uses the Ozark

-7-

National Forest and that one identified member has used it in the past. This is short of the mark.

Because the Society challenges federal action affecting the Ozark National Forest without alleging that a particular member has a specific plan to use that forest, there is no case or controversy before us, and we lack authority to adjudicate this dispute.

### III. *Conclusion.*

Accordingly, we dismiss the appeal for lack of jurisdiction.

_____