Justice Breyer,
with whom Justice Stevens, Justice Souter, and Justice Ginsburg join, dissenting.
The Court holds that the Sierra Club and its members (along with other environmental organizations) do not suffer any “ ‘concrete injury’ ” when the Forest Service sells timber for logging on many thousands of small (250-acre or less) woodland parcels without following legally required procedures — procedures which, if followed, could lead the Service to cancel or to modify the sales. Ante, at 497. Nothing in the record or the law justifies this counterintuitive conclusion.
*502 I
A
The plaintiffs, respondents in this case, are five environmental organizations. The Earth Island Institute, a California organization, has over 15,000 members in the United States, over 3,000 of whom “use and enjoy the National Forests of California for recreational, educational, aesthetic, spiritual and other purposes.” Corrected Complaint for Declaratory and Injunctive Relief in Case No. CIV-F-03-630 REC DLB (ED Cal.), ¶ 8, App. 31 (hereinafter Complaint). The Sequoia ForestKeeper, a small organization, has “100 plus” members who “use the forests of the Southern Sierra Nevada for activities such as hiking, bird and animal watching, aesthetic enjoyment, quiet contemplation, fishing and scientific study.” Id., ¶ 9, at 32. Heartwood, Inc., located in Illinois and Indiana, is a coalition of environmental organizations with “members” who “continually use the National Forests for the purposes of ecological health, recreation, aesthetic enjoyment, and other purposes.” Id., ¶ 10, at 33. The Center for Biological Diversity, located in Arizona, California, New Mexico, and Washington, has over 5,000 members who “use Forest Service lands,” and who are “dedicated to the preservation, protection, and restoration of biological diversity, native species and ecosystems in the Western United States and elsewhere.” Id., ¶ 11, at 33. The Sierra Club has more than “700,000 members nationwide, including thousands of members in California” who “use and enjoy the Sequoia National Forest” for “outdoor recreation and scientific study of various kinds, including nature study, birdwatching, photography, fishing, canoeing, hunting, backpacking, camping, solitude, and a variety of other activities.” Id., ¶ 12, at 34.
These five organizations point to a federal law that says the Forest Service “shall establish a notice and comment process,” along with a procedure for filing administrative *503 “appeals,” for “proposed actions ... concerning projects and activities implementing land and resource management plans . . . §322, 106 Stat. 1419, note following 16 U. S. C. § 1612. They add that the Service has exempted from “notice, comment, and appeal” processes its decisions that allow, among other things, salvage-timber sales on burned forest lands of less than 250 acres in size. 36 CFR §§ 215.4(a), 215.12(f) (2008); see also 68 Fed. Reg. 44607-44608 (2003) (describing projects exempted). And they claim that the Service’s refusal to provide notice, comment, and appeal procedures violates the statute. Complaint ¶¶ 105-106, App. 61.
B
The majority says that the plaintiffs lack constitutional standing to raise this claim. It holds that the dispute between the five environmental groups and the Forest Service consists simply of an abstract challenge; it does not amount to the concrete “Cas[e]” or “Controvers[y]” that the Constitution grants federal courts the power to resolve. Art. Ill, § 2, cl. 1. I cannot agree that this is so.
To understand the constitutional issue that the majority decides, it may prove helpful to imagine that Congress enacted a statutory provision that expressly permitted environmental groups like respondents here to bring cases just like the present one, provided (1) that the group has members who have used salvage-timber parcels in the past and are likely to do so in the future, and (2) that the group’s members have opposed Forest Service timber sales in the past (using notice, comment, and appeal procedures to do so) and will likely use those procedures to oppose salvage-timber sales in the future. The majority cannot, and does not, claim that such a statute would be unconstitutional. See Massachusetts v. EPA, 549 U. S. 497, 516-518 (2007); Sierra Club v. Morton, 405 U. S. 727, 734-738 (1972). How then can it find the present case constitutionally unauthorized?
*504 I believe the majority answers this question as follows: It recognizes, as this Court has held, that a plaintiff has constitutional standing if the plaintiff demonstrates (1) an “ 'injury in fact,’” (2) that is “fairly traceable” to the defendant’s “challenged action,” and which (B) a “favorable [judicial] decision” will likely prevent or redress. Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U. S. 167, 180-181 (2000). The majority does not deny that the plaintiffs meet the latter two requirements. It focuses only upon the first, the presence of “actual,” as opposed to “conjectural or hypothetical,” injury. Id., at 180. In doing so, it properly agrees that the “organizations” here can “assert the standing of their members. ” Ante, at 494. It points out that injuries to the “members’ recreational” or even “mere esthetic interests ... will suffice.” Ibid. It does not claim that the procedural nature of the plaintiffs’ claim makes the difference here, for it says only that “deprivation of a procedural right without some concrete interest” thereby affected, i. e., “a procedural right in vacuo,” would prove “insufficient to create Article III standing.” Ante, at 496 (emphasis added); see also EPA, supra, at 517-518. The majority assumes, as do I, that these unlawful Forest Service procedures will lead to substantive actions, namely, the sales of salvage timber on burned lands, that might not take place if the proper procedures were followed. But the majority then finds that the plaintiffs have not sufficiently demonstrated that these salvage-timber sales cause the plaintiffs an actual injury, that is, harm to the recreational, esthetic, or other environmental interests of organization members. Ante, at 494-496. To put the matter in terms of my hypothetical statute, the majority holds that the plaintiff organizations, while showing that they have members who have used salvage-timber sale parcels in the past (i. e., parcels that the Service does not subject to the notice, comment, and appeal procedures required by law), have failed to show that they have members likely to use such parcels in the future.
*505 II
How can the majority credibly claim that salvage-timber sales, and similar projects, are unlikely to harm the asserted interests of the members of these environmental groups? The majority apparently does so in part by arguing that the Forest Service actions are not “imminent” — a requirement more appropriately considered in the context of ripeness or the necessity of injunctive relief. See Ohio Forestry Assn., Inc. v. Sierra Club, 523 U. S. 726, 734 (1998). I concede that the Court has sometimes used the word “imminent” in the context of constitutional standing. But it has done so primarily to emphasize that the harm in question — the harm that was not “imminent” — was merely “conjectural” or “hypothetical” or otherwise speculative. Lujan v. Defenders of Wildlife, 504 U. S. 555, 560 (1992) (internal quotation marks omitted). Where the Court has directly focused upon the matter, i. e., where, as here, a plaintiff has already been subject to the injury it wishes to challenge, the Court has asked whether there is a realistic likelihood that the challenged future conduct will, in fact, recur and harm the plaintiff. That is what the Court said in Los Angeles v. Lyons, 461 U. S. 95 (1983), a case involving a plaintiff’s attempt to enjoin police use of chokeholds. The Court wrote that the plaintiff, who had been subject to the unlawful chokehold in the past, would have had standing had he shown “a realistic threat” that reoccurrence of the challenged activity would cause him harm “in the reasonably near future.” Id., at 107, n. 7, 108 (emphasis added). Precedent nowhere suggests that the “realistic threat” standard contains identification requirements more stringent than the word “realistic” implies. See Blum v. Yaretsky, 457 U. S. 991, 1000 (1982).
How could the Court impose a stricter criterion? Would courts deny standing to a holder of a future interest in property who complains that a life tenant’s waste of the land will almost inevitably hurt the value of his interest — though he will have no personal interest for several years into the fu *506 ture? Would courts deny standing to a landowner who complains that a neighbor’s upstream dam constitutes a nuisance — even if the harm to his downstream property (while bound to occur) will not occur for several years? Would courts deny standing to an injured person seeking a protection order from future realistic (but nongeographically specific) threats of further attacks?
To the contrary, a threat of future harm may be realistic even where the plaintiff cannot specify precise times, dates, and GPS coordinates. Thus, we recently held that Massachusetts has standing to complain of a procedural failing, namely, the Environmental Protection Agency’s failure properly to determine whether to restrict carbon dioxide emissions, even though that failing would create Massachusetts-based harm which (though likely to occur) might not occur for several decades. EPA, 549 U. S., at 522-523.
The Forest Service admits that it intends to conduct thousands of further salvage-timber sales and other projects exempted under the challenged regulations “in the reasonably near future.” See Defendants’ Motion to Clarify and Amend Judgment in No. CIV-F-03-6386-JKS-DLB (ED Cal.), pp. 13-14. How then can the Court deny that the plaintiffs have shown a “realistic” threat that the Forest Service will continue to authorize (without the procedures claimed necessary) salvage-timber sales, and other Forest Service projects, that adversely affect the recreational, esthetic, and environmental interests of the plaintiffs’ members?
Consider: Respondents allege, and the Government has conceded, that the Forest Service took wrongful actions (such as selling salvage timber) “thousands” of times in the two years prior to suit. Id., at 6; see also id., Exh. 2, Decl. of Gloria Manning, Associate Deputy Chief for National Forest System ¶ 6, p. 3 (identifying 3,377 “proposed decisions,” “[a]s of July 1, 2005,” that would be excluded from notice, comment, and appeal procedures). The Complaint alleges, and no one denies, that the organizations, the Sierra Club for *507 example, have hundreds of thousands of members who use forests regularly across the Nation for recreational, scientific, esthetic, and environmental purposes. Complaint ¶¶ 8-12, App. 31-34. The Complaint further alleges, and no one denies, that these organizations (and their members), believing that actions such as salvage-timber sales harm those interests, regularly oppose salvage-timber sales (and similar actions) in proceedings before the agency. Ibid. And the Complaint alleges, and no one denies, that the organizations intend to continue to express their opposition to such actions in those proceedings in the future. Ibid.
Consider further: The affidavit of a member of Sequoia ForestKeeper, Ara Marderosian, attached to the Complaint, specifies that Marderosian had visited the Burnt Ridge Project site in the past and intended to return. The majority concedes that this is sufficient to show that Marderosian had standing to challenge the Burnt Ridge Project. The majority must therefore agree that “at least one identified member ha[s] suffered . . . harm.” Ante, at 498. Why then does it find insufficient the affidavit, also attached to the Complaint, of Jim Bensman, a member of Heartwood, Inc.? That affidavit states, among other things, that Bensman has visited 70 national forests, that he has visited some of those forests “hundreds of times,” that he has often visited the Allegheny National Forest in the past, that he has “probably commented on a thousand” Forest Service projects including salvage-timber sale proposals, that he intends to continue to comment on similar Forest Service proposals, and that the Forest Service plans in the future to conduct salvage-timber sales on 20 parcels in the Allegheny National Forest — one of the forests he has visited in the past. ¶¶6, 13, App. E to Pet. for Cert. 68a, 69a, 71a.
The Bensman affidavit does not say which particular sites will be affected by future Forest Service projects, but the Service itself has conceded that it will conduct thousands of exempted projects in the future. Why is more specificity *508 needed to show a “realistic” threat that a project will impact land Bensman uses? To know, virtually for certain, that snow will fall in New England this winter is not to know the name of each particular town where it is bound to arrive. The law of standing does not require the latter kind of specificity. How could it? And Sierra Club v. Morton, 405 U. S. 727, on which the majority so heavily relies, involved plaintiffs who challenged (true, a “massive”) development, but only on a single previously determined site, about 80 acres in size, in a portion of the forest with a “limited .. . number of visitors.” Id., at 728. The Court’s unwillingness to infer harm to the Sierra Club’s members there does not demand a similar unwillingness here, where the challenge is to procedures affecting “thousands” of sites, involving hundreds of times as much acreage, where the precise location of each may not yet be known. In Sierra Club v. Morton, it may have been unreasonable simply to assume that members would suffer an “injury in fact.” But here, given the very different factual circumstances, it is unreasonable to believe they would not.
Whatever doubt may remain is settled by the affidavits the plaintiffs submitted after the Burnt Ridge dispute was settled (while the other claims in the Complaint remained alive). The majority says it will not consider those affidavits because they were submitted “[ajfter the District Court had entered judgment.” Ante, at 495, n. But the plaintiffs submitted the affidavits after judgment (in opposition to the Government’s motion for a stay) because the Burnt Ridge dispute on which they had relied to show standing at the outset of suit had by that point been settled. No longer wishing to rely solely on evidence of their members’ interest in that particular project, the plaintiff organizations submitted several other affidavits. Why describe this perfectly sensible response to the settlement of some of the Complaint's ¡claims as a “retroactiv[ej” attempt to “me[e]t the challenge to their standing at the time of judgment”? Ibid. *509 In fact, the Government did not challenge standing until that point, so of course respondents (who all agree had standing at the outset) did not respond with affidavits until later— when their standing was challenged. This can hardly be characterized as an attempt to “resurrect and alter the outcome” in the case. Ante, at 500. Regardless, the Constitution does not bar the filing of further affidavits, nor does any statute. The Federal Rules of Civil Procedure contain no such bar. Indeed, those Rules provide a judge with liberal discretion to permit a plaintiff to amend a complaint — even after one dispute (of several) is settled. So why would they not permit the filing of affidavits — at least with the judge’s permission? See Fed. Rule Civ. Proc. 15(d) (West 2008 rev. ed.) (“The court may permit supplementation even though the original pleading is defective in stating a claim or defense”).
The affidavits in question describe a number of then-pending Forest Service projects, all excluded from notice, comment, and appeal under the Forest Service regulations and all scheduled to take place on parcels that the plaintiff organizations’ members use. Erik Ryberg, for example, a member of the Center for Biological Diversity, described in his affidavit a proposed logging project scheduled for the Payette National Forest — an area with which he is “personally familiar.” ¶ 6, App. 90. A second affidavit filed by Jim Bensman described a salvage-timber sale scheduled for the Hoosier National Forest — an area Bensman had visited “multiple times” and to which he planned to return in the coming weeks — and one planned for the Daniel Boone National Forest — also used by Bensman — which would “impact [Heartwood’s] members[’] use of the areas.” ¶¶ 8-9, id., at 85-86. The affidavits also describe, among other things, the frequency with which the organizations’ members routinely file administrative appeals of salvage-timber sales and identify a number of proposed and pending projects that certain Sierra Club members wished to appeal. See Decl. of René Voss *510 ¶ 3, id., at 94 (describing a proposed logging and prescribed burn planned for the Gallatin National Forest); Decl. of Craig Thomas ¶¶ 3,13, id., at 95, 98 (describing Thomas’ “use” and “enjoy[ment]” of the “Sierra Nevada national forests for recreational, aesthetic, scientific and professional pursuits,” and attesting to “eighteen separate logging projects,” all categorically excluded, proposed for one such forest tract).
These allegations and affidavits more than adequately show a “realistic threat” of injury to plaintiffs brought about by reoccurrence of the challenged conduct — conduct that the Forest Service thinks lawful and admits will reoccur. Many years ago the Ninth Circuit warned that a court should not “be blind to what must be necessarily known to every intelligent person.” In re Wo Lee, 26 F. 471, 475 (1886). Applying that standard, I would find standing here.
* * *
I recognize that the Government raises other claims and bases upon which to deny standing or to hold that the case is not ripe for adjudication. I believe that these arguments are without merit. But because the majority does not discuss them here, I shall not do so either.
With respect, I dissent.