24CA0199 Insight Surgery v WSi Healthcare 11-26-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0199
Douglas County District Court No. 19CV98
Honorable Andrew C. Baum, Judge

---

Insight Surgery Center, LLC,

Plaintiff-Appellant and Cross-Appellee,

v.

WSi Healthcare Personnel, Inc.,

Defendant-Appellee and Cross-Appellant.

---

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE FOX
Brown and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 26, 2025

---

McConnell Van Pelt, LLC, Michael T. McConnell, Jonathan J. Corrigan, Kellsey A. Hansen, Denver, Colorado, for Plaintiff-Appellant and Cross-Appellee

Hershey Decker Drake, C. Todd Drake, Kari M. Hershey, Brenna Shannon, Lone Tree, Colorado, for Defendant-Appellee and Cross-Appellant

¶ 1    Insight Surgery Center, LLC (Insight) appeals the district court's order dismissing its third-party complaint against WSi Healthcare Personnel, Inc. (WSi).  We reverse and remand for further proceedings.  WSi cross-appeals the court's order denying its motion for a directed verdict, which we affirm.

## I.    Background

### A.    The Underlying Action and Third-Party Complaint

¶ 2    This appeal arises from a third-party complaint in an underlying wrongful death suit.  In October 2017, the decedent underwent a liposuction procedure at Insight's facility and died the following day.  WSi, a healthcare personnel staffing agency, provided medical staff to Insight.  Lorez Hinson, a WSi nurse, was one of the nurses who treated the decedent at Insight's post anesthesia care unit (PACU).

¶ 3    In 2019, the decedent's estate (the Estate) brought a wrongful death action against several individuals and entities.  The Estate later dismissed all parties except Insight and amended its complaint to allege that Insight was liable for the negligence of several nurses, including Hinson.  Because Hinson was a WSi employee, Insight asked WSi to defend and indemnify it pursuant to an agreement

1

between WSi and Insight's predecessor, Renewal Surgery Center, LLC (Renewal). WSi refused, asserting that Insight was not a party to the agreement. Insight later filed a third-party complaint against WSi alleging breach of contract and seeking contribution, defense, and indemnification in the wrongful death action.

## B. The Relevant Agreements

¶ 4 Insight's third-party claims implicated three contracts. First, under a 2014 "Client Agreement" (2014 Agreement), WSi provided healthcare personnel to Renewal via three possible staffing arrangements: a "Temp to Hire Option," a "Direct Hire Option," and a "PRN Option."[1] The 2014 Agreement also listed hourly rates for "OR nurses," "PACU nurses," "scrub techs," and "sterile processors." And the 2014 Agreement automatically renewed each year, allowed written modifications, bound the parties' successors, and provided that it "constitute[d] the entire understanding and agreement between the parties . . . and supersede[d] all prior agreements, arrangements and understanding . . . with respect to

---

[1] Although not defined in the 2014 Agreement, a PRN is a "per request needed" or "as needed" employee. An "OR" nurse is an operating room nurse.

its subject matter" (merger clause). As discussed further in Part III, the 2014 Agreement also included an indemnification clause (the basis for Insight's third-party complaint) and a description of the parties' respective responsibilities.

¶ 5 In 2016, WSi and Renewal executed a second "Client Agreement" (2016 Agreement). It was significantly shorter and lacked many of the 2014 Agreement's general terms, such as clauses addressing merger, successor liability, indemnification, venue, modification, and insurance. Like the 2014 Agreement, it outlined the temp to hire, direct hire, and PRN options, but the 2016 Agreement listed the hourly rate only for "Surg Techs" (or surgical technicians).

¶ 6 Finally, Renewal and Insight executed a July 2017 Asset Purchase Agreement (APA) in which Renewal sold Insight "all of its core assets and assign[ed] all of its core contracts used in the operation of its surgery center." Renewal agreed "to sell, assign, transfer, convey and deliver to Insight" Renewal's rights and obligations under "the Assumed Contracts," which were listed in an

attachment to the APA and included a "WSi Healthcare Personnel Agreement Dated August 29, 2016."[2]

C.    WSi's Summary Judgment Motion and the Jury Verdict

¶ 7    Because Insight's third-party claims relied on the 2014 Agreement's indemnity clause, Insight moved for a determination of law that Renewal assigned the 2014 Agreement to Insight under the APA.  The district court denied the motion, concluding that whether the 2014 Agreement applied to Insight was an issue of fact for a jury to determine.

¶ 8    Because Insight was not a party to the 2014 Agreement — and the APA explicitly assigned only the 2016 Agreement (which lacked an indemnity provision) — WSi moved for summary judgment, arguing that Insight lacked privity of contract to invoke the indemnity clause.  It argued that the APA assigned only the 2016 Agreement, not the 2014 Agreement, and Insight could not use extrinsic evidence (the 2014 Agreement) "to create ambiguities in

---

[2] Although the 2016 Agreement was to "be observed beginning" August 26, it was executed on August 29 and August 31.  The parties appear to agree that the WSi contract referenced in the APA is the 2016 Agreement.

4

otherwise unambiguous contracts" (the 2016 Agreement and the APA).

¶ 9 The district court denied WSi's motion. It agreed that the APA "unambiguously assign[ed] only the 2016 Agreement . . . to Insight," but it concluded that this did not resolve "whether the 2016 Agreement was a separate contract that replaced the 2014 Agreement [i.e., a novation[3]] or . . . simply amended the 2014 Agreement." The court noted that the 2016 Agreement lacked a merger clause (the inclusion of which could support a novation) but also lacked other language suggesting it modified an earlier agreement. The court also compared the 2014 and 2016 Agreements, noting, for example, that the 2014 Agreement allowed amendments and automatically renewed unless terminated by written notice, but nothing in the 2016 Agreement suggested that it amended or terminated the 2014 Agreement. Accordingly, the court found the 2016 Agreement facially "ambiguous as to whether it is a standalone contract or an amendment/codicil."

---

[3] A novation occurs when one contract is extinguished and substituted with a new contract. *Oldham v. Pedrie*, 2015 COA 95, ¶ 32.

5

¶ 10    After concluding that the 2016 Agreement was ambiguous, the court accepted extrinsic evidence to determine WSi and Renewal's intent in 2016. But because this inquiry was factual, it concluded that a jury would determine whether the 2016 Agreement, which the APA assigned to Insight, was a novation "that entirely superseded the 2014 Agreement" or whether it "amended or supplemented the 2014 Agreement." If the jury found that the 2016 Agreement amended the 2014 Agreement, the 2014 Agreement remained effective and applied to Insight, and Insight could pursue its third-party claims. But if there was a novation, the 2014 Agreement would not apply to Insight.

¶ 11    On the second day of a bifurcated jury trial, the Estate moved for a directed verdict, which WSi joined. The court declined to enter a directed verdict, incorporating its order denying WSi's summary judgment motion. At the trial's conclusion, the jury found that the 2016 Agreement was not a novation that superseded the 2014 Agreement; rather, it was an amendment.

### D.    The Court Dismisses the Third-Party Complaint

¶ 12    On September 1, 2023, after the jury's verdict but before a September 7 status conference, the Estate amended its complaint

to add a negligent hiring and supervision claim against Insight. As discussed further in Part III, during the September 7 status conference, the court dismissed Insight's third-party complaint. It held that Insight's vicarious liability for Hinson's conduct abrogated WSi's duty to defend and found the indemnity provision void as against public policy. Insight asked the court to reconsider, which the court denied. The underlying wrongful death action was dismissed in February 2024 after Insight and the Estate settled.

### E. This Appeal

¶ 13 Insight appeals the court's order dismissing its third-party complaint, and WSi cross-appeals the court's denial of its motion for a directed verdict. We address the cross-appeal first because it requires us to consider whether the 2014 Agreement applied to Insight. Because we reject WSi's contentions, we then turn to Insight's appeal. And we conclude that the court erred in its interpretation of the 2014 Agreement's indemnity provision and by concluding that it is void as against public policy.

### II. WSi's Cross-Appeal

¶ 14 WSi initially challenged the court's order denying its motion for summary judgment, which — as Insight noted — is not a final,

appealable order.  *See Trudgian v. LM Gen. Ins. Co.*, 2024 COA 87, ¶ 37 (dismissing a cross-appeal challenging an order denying a summary judgment motion).  However, as Insight also noted, the district court incorporated its order denying summary judgment into its order denying WSi's motion for a directed verdict.  Therefore, we consider the court's rationale for denying summary judgment as it applies to its denial of the directed verdict.

¶ 15    We address WSi's arguments on cross-appeal as follows: First, we consider the district court's conclusion that the 2016 Agreement was ambiguous and address whether the court improperly considered extrinsic evidence to reach that conclusion.  We next consider whether the court properly denied the motion for directed verdict and whether Insight's third-party complaint could proceed following the jury's finding that the 2016 Agreement amended the 2014 Agreement.  We perceive no error.

## A.    Standard of Review

¶ 16    We review orders denying a motion for directed verdict de novo.  *Gilley v. Oviatt*, 2025 COA 27, ¶ 12.  Directed verdicts are generally disfavored and are appropriate only "[i]f there is no evidence to support an element of a claim."  *Id.* at ¶¶ 11-12.  In

making this determination, "[t]he . . . court must view the evidence in the light most favorable to the nonmoving party." *Id.* at ¶ 11. We also review contract interpretation de novo, including whether a contract is ambiguous. *Gagne v. Gagne*, 2014 COA 127, ¶ 50.

### B. The District Court Could Consider Extrinsic Evidence to Find the 2016 Agreement Ambiguous

#### 1. Applicable Law

¶ 17 "A contract is ambiguous when it is reasonably susceptible to more than one meaning." *Pub. Serv. Co. of Colo. v. Meadow Island Ditch Co. No. 2*, 132 P.3d 333, 339 (Colo. 2006). To determine if a contract is ambiguous, we typically "examin[e] the instrument's language and constru[e] that language in harmony with the plain and generally accepted meaning of the words employed." *French v. Centura Health Corp.*, 2022 CO 20, ¶ 25. Courts generally do not consider extrinsic evidence (evidence beyond the four corners of the contract) unless a contract is facially ambiguous. *Id.* However, as with most rules, there are exceptions.

¶ 18    For example, courts sometimes conditionally admit extrinsic evidence to determine whether a contract is ambiguous.[4]  *See Pepcol Mfg. Co. v. Denv. Union Corp.*, 687 P.2d 1310, 1314 n.3 (Colo. 1984) (explaining that courts may conditionally admit extrinsic evidence); *E. Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 974 (Colo. 2005) (describing a shift away from the "rigid 'four corners' rule" (citation omitted)); *Meadow Island,* 132 P.3d at 339 (noting that conditional extrinsic evidence does not include the parties' expressions of intent).

¶ 19    Similarly, under the parol evidence rule, evidence of a prior agreement is admissible to interpret a later agreement in certain circumstances.  *See LTCPRO, LLC v. Johnson*, 2024 COA 123, ¶¶ 22-26; Restatement (Second) of Contracts § 213 (Am. L. Inst. 1981).  "When an agreement is completely integrated, evidence of prior agreements may not be used to contradict, vary, or supplement its terms."  *Johnson,* ¶ 22.  If an agreement is only partially integrated, evidence of a prior agreement may

---

[4] Colorado Supreme Court opinions take conflicting positions on this issue.  *See, e.g.*, *Am. Fam. Mut. Ins. Co. v. Hansen*, 2016 CO 46, ¶ 4 ("[A]mbiguity must appear in the four corners of the document *before* extrinsic evidence can be considered.").

"supplement" but not contradict the partially integrated agreement's terms.[5] *Merk v. Jewel Food Stores Div. of Jewel Cos.*, 945 F.2d 889, 892 (7th Cir. 1991); 11 Richard A. Lord, *Williston on Contracts* § 33:22, Westlaw (4th ed. database updated May 2025).

¶ 20     To determine the level of integration, "'wide latitude must be allowed for inquiry into circumstances bearing on the intention of the parties' . . . when the contract itself does not unambiguously answer that question." *Johnson*, ¶ 41 (citation omitted); Restatement (Second) of Contracts § 213 cmt. b (instructing courts to consider "all relevant evidence," including both agreements). Thus, courts may consider two agreements to decide if one of them is fully or partially integrated (or ambiguous as to integration). *See Johnson*, ¶¶ 24, 30; Restatement (Second) of Contract § 210 cmt. b ("[A] writing cannot of itself prove its own completeness . . . .").

¶ 21     Moreover, the parol evidence rule "does not relate to future agreements and does not bar extrinsic evidence that proves that the parties subsequently modified their integrated writing." *Reynolds v.*

---

[5] Complete and partial integration reflect the extent to which the parties intended their agreement to be a complete and exclusive expression of the terms. *See United States v. Rockwell Int'l Corp.*, 124 F.3d 1194, 1199 (10th Cir. 1997).

*Gentry Fin. Corp. & Royal Mgmt.*, 2016 UT App 35, ¶ 18 (citation omitted); *Beggerly v. Gbur*, 169 Cal. Rptr. 166, 171 (Ct. App. 1980) (same). Similarly, "[p]arol evidence is admissible when determining whether a novation has occurred." 30 *Williston on Contracts* § 76:42; *see Oldham*, ¶ 30 ("[P]roof of novation may be established by evidence of an express understanding to this effect or by circumstances showing such assent.").

### 2. Analysis

¶ 22 WSi contends that the district court erroneously considered the 2014 Agreement to determine the 2016 Agreement's ambiguity. But WSi's argument construes the issue too narrowly. Because the APA assigned the 2016 Agreement to Insight, Insight argued that the assignment included the 2014 Agreement (as modified by the 2016 Agreement). Thus, the question before the court was not limited to examining the 2016 Agreement; the court had to determine whether the 2016 Agreement amended or replaced the 2014 Agreement.

¶ 23 WSi asserts that the district court could not consider Insight's argument that the 2016 Agreement amended the 2014 Agreement unless it found "ambiguity within the 2016 Agreement itself." This

argument misses the mark for several reasons. First, WSi conceptually flips the parol evidence rule, which does not prohibit extrinsic evidence to determine whether an earlier agreement was amended or replaced by a later agreement. *Reynolds*, ¶ 18 (amendment); 30 *Williston on Contracts* § 76:42 (novation). Second, notwithstanding the parol evidence rule, the court could conditionally consider extrinsic evidence, other than the parties' statements of intent, to determine whether the 2016 Agreement was ambiguous as to whether it amended or supplanted the 2014 Agreement. *E.g.*, *Meadow Island*, 132 P.3d at 339.

¶ 24 Finally, although the court did not explicitly consider whether the 2016 Agreement was fully or partially integrated, courts often apply this framework to determine if evidence of a prior agreement can be used to interpret a later agreement. *See, e.g., Glover v. Innis*, 252 P.3d 1204, 1208 (Colo. App. 2011). And the court could consider extrinsic evidence to decide if the 2016 Agreement was fully or partially integrated. *Johnson*, ¶¶ 24, 30; Restatement (Second) of Contracts § 213 cmt. b. If it was only partially integrated, the 2014 Agreement was then admissible to add to, but not contradict, the 2016 Agreement's terms. *Merk*, 945 F.2d at 892.

¶ 25    The court effectively engaged in this analysis when it compared the two agreements and found that the 2016 Agreement lacked a merger clause and other terms present in the 2014 Agreement that would suggest full integration. *See Johnson*, ¶¶ 22, 27 (explaining that merger clauses often indicate complete integration); *In re Indian Motorcycle Litig.*, 307 B.R. 7, 12 (D. Mass. 2004) (finding a later agreement not fully integrated because it lacked terms from an earlier agreement that suggested full integration, including venue, successor liability, and severability).

¶ 26    Under several legal principles, the district court could consider extrinsic evidence to find the 2016 Agreement ambiguous.[6] It also did not err by finding the 2016 Agreement ambiguous as to whether it replaced or amended the 2014 Agreement. And its ambiguity finding was based on the contracts' terms, not the parties'

---

[6] To the extent WSi suggests that the 2016 Agreement was a separate contract that did not supplement or amend the 2014 Agreement, this argument undercuts its contention that extrinsic evidence was inadmissible. *See Rosemann v. Roto-Die, Inc.*, 377 F.3d 897, 901 (8th Cir. 2004) ("[T]he parol evidence rule does not bar evidence of 'a wholly separate and independent contract that did not inherently conflict with the written [integrated] agreement.'" (citation omitted)); Restatement (Second) of Contracts §§ 213 cmt. c, 216 cmt. c (Am. L. Inst. 1981).

14

statements of intent. *See Fed. Deposit Ins. Corp. v. Fisher*, 2013 CO 5, ¶ 12 ("[T]he fact that the parties differ in their understanding of the agreement does not create an ambiguity.").

¶ 27 First, the 2016 Agreement's omission of terms present in the 2014 Agreement suggested that the parties did not intend to replace the 2014 Agreement. *See Indian Motorcycle Litig.*, 307 B.R. at 12. Next, the 2016 Agreement referenced only surgical technicians, but the third-party dispute involved a PACU nurse, a role addressed only in the 2014 Agreement. However, the 2016 Agreement did not reference the 2014 Agreement or indicate an intent to terminate it. Therefore, the 2016 Agreement was "reasonably susceptible to more than one meaning." *Meadow Island*, 132 P.3d at 339. And the meaning of an ambiguous contract "is generally an issue of fact to be determined in the same manner as other disputed factual issues." *E. Ridge of Fort Collins, LLC*, 109 P.3d at 974; *see also Oldham v. Pedrie*, 2015 COA 95, ¶ 30 ("Whether there has been a novation is ordinarily a question of fact . . . ."). So a jury could (and did) determine whether the 2016 Agreement replaced or amended the 2014 Agreement.

## C.  The Court Properly Denied the Motion for Directed Verdict and Allowed Insight's Third-Party Claims to Proceed

¶ 28　WSi next argues that the court erroneously concluded that Insight's third-party claims could proceed if the jury found that the 2016 Agreement amended the 2014 Agreement.  Specifically, it contends that the 2014 Agreement could not apply to Insight unless Insight also proved that it was Renewal's successor or assignee under the 2014 Agreement.  WSi further asserts that the 2016 Agreement did not amend the 2014 Agreement, which we construe as an argument that court erred by denying WSi's motion for a directed verdict.  First, we conclude that the court properly denied a directed verdict.  Second, we reject WSi's argument that Insight's third-party claims could proceed only after it had proved it was Renewal's successor or assignee.

### 1.  The Directed Verdict

¶ 29　Because the 2016 Agreement was ambiguous, the jury could consider extrinsic evidence to decide if it was a novation or amendment.  *E. Ridge of Fort Collins, LLC,* 109 P.3d at 974.  This included, for example, "circumstances surrounding the transaction" and the parties' conduct before the controversy.  *Id.*

¶ 30    The jury heard evidence that, on August 26, 2016 — the first date the 2016 Agreement was to "be observed" — a WSi employee emailed Insight, "I have attached our new bill rates. . . .  If agreeable, [please] sign and return. . . .  [W]e need to . . . pay higher wages so that we have a larger pool of surg techs available."  WSi's chief executive officer (CEO) also testified that "surgical tech[s] and scrub tech[s] are the same thing" and that WSi provided surgical technicians to Renewal before 2016.  Thus, although the 2014 Agreement included "scrub tech[s]" and the 2016 Agreement included "surg tech[s]," they addressed the same position.  Together, this evidence supported Insight's argument that the 2016 Agreement amended the 2014 Agreement, including the hourly rate for surgical technicians.

¶ 31    Next, although PACU nurses were listed only in the 2014 Agreement, WSi's CEO testified that WSi provided PACU nurses to Renewal and Insight after 2016.[7]  Similarly, only the 2014

---

[7] We also reject WSi's argument that the addendum to the 2016 Agreement, which listed different types of staff that WSi could provide, was evidence that the 2016 Agreement encompassed PACU nurses and other WSi personnel.  WSi's CEO testified that this addendum was effectively a marketing material.

17

Agreement required proof of liability insurance, but WSi submitted liability insurance certificates after 2016. WSi's CEO testified that WSi also sent insurance certificates upon request, regardless of any contractual obligation, but *conflicting* evidence differs from *no* evidence. *See Smith v. Mehaffy*, 30 P.3d 727, 731 (Colo. App. 2000). Thus, evidence that WSi and Renewal (later Insight) continued to perform under the 2014 Agreement after entering into the 2016 Agreement supported the amendment argument. *See E. Ridge of Fort Collins, LLC*, 109 P.3d at 974 (inferring intent from the parties' conduct).

¶ 32      Finally, the jury could infer from the agreements themselves that the 2016 Agreement was meant to amend, rather than replace, the 2014 Agreement. *See Indian Motorcycle Litig.*, 307 B.R. at 12 (finding an amendment in similar circumstances because "[i]t [was] highly improbable that the parties intended to eliminate" terms from the later agreement that were present in the earlier agreement "without any mention of that intent"). WSi relies on evidence presented at trial that Renewal's counsel never received the 2014 Agreement when drafting the APA, and Renewal and Insight explicitly chose which contracts to assign in the APA, which did not

include the 2014 Agreement. Thus, WSi argues, there was no evidence that Insight was Renewal's successor or assignee. We reject this contention. First, the question at trial concerned the 2016 and 2014 Agreements, not the APA. Second, as we explain below, the 2014 Agreement could apply to Insight even if it was not Renewal's successor or assignee.

¶ 33 Viewing the evidence in a light most favorable to Insight, there was evidence to support its claim that the 2016 Agreement amended the 2014 Agreement such that the court properly denied a directed verdict in WSi's favor. *See Gilley*, ¶¶ 11-12.

2. The Third-Party Claims Could Proceed from the Jury Verdict

¶ 34 WSi dedicates much of its cross-appeal to arguing that the 2014 Agreement cannot apply to Insight unless (1) the APA directly assigned the 2014 Agreement or (2) Insight was Renewal's successor or assignee under the 2014 Agreement. In other words, WSi suggests that the jury's verdict — that the 2016 Agreement amended the 2014 Agreement — was legally insufficient for the 2014 Agreement to apply to Insight. We are not persuaded.

¶ 35 First, WSi contends that the APA unambiguously assigned only the 2016 Agreement because the APA made clear that it was

assigning to Insight only the assumed contracts, which did not include the 2014 Agreement.  But WSi overlooks "a legal principle [that] is so basic that it is nearly intuitive, and is stated infrequently":

> Modifications do not necessarily abrogate the original contract entirely; indeed, the terms of the old contract are still to be followed so far as not changed or as inconsistent with the new terms, *and the governing contract may be said to be composed of the new terms and the unchanged terms of the old.*

*Marine Transp. Lines, Inc. v. Int'l Org. of Masters, Mates & Pilots*, 696 F. Supp. 1, 16 (S.D.N.Y. 1988) (emphasis added) (quoting *Robinson v. Crosson*, 368 P.2d 791, 792 (Colo. 1962)), *aff'd*, 878 F.2d 41 (2d Cir. 1989).

¶ 36    A modified contract includes the modified terms and any original terms consistent with the modification.  *E.g.*, *Chavarria v. Bruce Nagel & Partners Architects, P.C.*, 220 N.Y.S.3d 57, 61 (App. Div. 2024) ("[M]odification of a contract results in the creation of a new contract between the parties, which supplants only the provisions of the original contract affected by the modification while leaving the unaffected provisions intact."); *Ass'n Res., Inc. v. Wall*, 2

A.3d 873, 902 (Conn. 2010) ("The contract as modified becomes a new contract between the parties." (citation omitted)).

¶ 37 WSi treats the two agreements as entirely separate contracts. But because the 2016 Agreement amended the 2014 Agreement, the new contract became the 2014 Agreement as modified by the 2016 Agreement. *Wall*, 2 A.3d at 902. In turn, the APA's assignment of the 2016 Agreement included the 2014 Agreement *as modified* by the 2016 Agreement. *See id.* Therefore, the 2014 Agreement applied to Insight regardless of whether it was designated as Renewal's successor or assignee. We also reject WSi's reliance on the APA's assurance that the assumed contracts had not been modified; the *2014 Agreement*, which was not an assumed contract, was modified.

¶ 38 Thus, the district court did not err by concluding that Insight's third-party claims, which were based on the 2014 Agreement, could proceed from the jury's finding that the 2016 Agreement amended the 2014 Agreement.

### III. Insight's Appeal

¶ 39 We now turn to Insight's appeal, which challenges the district court's order dismissing its third-party complaint. Insight first

21

contends that the court erred by sua sponte dismissing its complaint without providing an opportunity for argument and response. Insight also argues that the court erred in its interpretation of the 2014 Agreement's indemnity provision and by concluding that it was void as against public policy. We conclude that the district court erred.

## A. Additional Facts

¶ 40 In the 2014 Agreement, WSi agreed to supervise its personnel administratively "[w]ith the exception of direct patient care." WSi screened its personnel, but WSi personnel were bound by Insight's policies and procedures and received facility orientation from Insight. Under the indemnity clause, WSi agreed to "defend, indemnify, and hold harmless [Insight] from any claim, liability, loss, cost, fines or penalties or expenses . . . arising from or related to negligent . . . conduct of Temporary Staff, including, without limitation, claims for third party . . . injuries . . . or any other claim of any kind or character."

¶ 41 After the jury's verdict established that the 2014 Agreement applied to Insight, the Estate moved for a determination of law that Hinson (the nurse supplied by WSi) was Insight's loaned employee.

*See Settle v. Basinger*, 2013 COA 18, ¶ 33 (explaining that a person or entity that "borrows" another's employee can be liable for the employee's negligence under certain circumstances).  The court held that, under the 2014 Agreement, "Insight had the right to control . . . Hinson's direct care of all patients, including [the decedent]." The court ultimately concluded that Hinson was Insight's loaned employee such that Insight could be vicariously liable for her negligent conduct.

¶ 42     At the September 7 status conference, the district court considered the 2014 Agreement's indemnity provision.  It noted that the provision applied to claims or liability "arising from or related to negligent . . . conduct of Temporary Staff," which likely included Hinson.  But because Hinson was Insight's loaned employee, Insight was responsible for supervising her direct patient care and vicariously liable for her negligence.  The court thus held that WSi had no duty to defend Insight because the Estate's allegations applied only to Hinson's direct patient care, "and WS[i] had no control over how . . . Hinson provided direct care while working at Insight."  Holding that it made "no sense that WS[i] should have a duty to defend where it had absolutely no control or responsibility

23

for" Hinson's direct care of the decedent, the district court dismissed Insight's claim regarding WSi's duty to defend.

¶ 43    With respect to the third-party claim regarding WSi's duty to indemnify Insight, the court cited *Brochner v. Western Insurance Co.*, 724 P.2d 1293 (Colo. 1986), and section 13-50.5-102, C.R.S. 2025, and concluded that the contractual provision was "void against public policy because it would require WS[i] to pay all of the damages . . . or . . . a disproportionate share of damages . . . regardless of its proportionate fault." Ultimately, the court dismissed the entire third-party complaint and WSi as a party.

¶ 44    In its order denying Insight's motion for reconsideration, the district court took a slightly different approach from its earlier oral order. It analyzed cases considering whether indemnity agreements expressed sufficient intent to indemnify a party for its own negligence and then concluded that the 2014 Agreement failed to express such intent. The court concluded that the provision did not indemnify Insight only against Insight's own negligence because it did not "contain clear and unequivocal language holding Insight harmless for its own negligent acts."

## B. Standard of Review

¶ 45 We review de novo whether a contract violates public policy. *Calvert v. Mayberry*, 2019 CO 23, ¶ 13. We also review de novo a district court's legal conclusions, *Premier Members Fed. Credit Union v. Block*, 2013 COA 128, ¶ 27, including its conclusions regarding contract interpretation, *Gagne*, ¶ 50. "An indemnity provision 'should be enforced according to the plain and generally accepted meaning of its language and interpreted in its entirety to give effect to all of its provisions so that none [is] rendered meaningless.'" *D.R. Horton, Inc.-Denv. v. D & S Landscaping, LLC*, 215 P.3d 1163, 1171 (Colo. App. 2008) (citation omitted).

## C. Sua Sponte Dismissal

¶ 46 We first conclude that even if the district court erred by sua sponte dismissing Insight's third-party complaint, any error was harmless because Insight presented argument on the issue in its motion for reconsideration, which the court thoroughly considered. *See Ferrera v. Nielsen*, 799 P.2d 458, 460 (Colo. App. 1990) (entering summary judgment on an issue not raised by the parties was harmless where the party addressed the issue in a motion to reconsider). Additionally, because we may review the merits of a

sua sponte ruling on appeal (even absent a timely objection), *Rinker v. Colina-Lee*, 2019 COA 45, ¶ 26, it would make little sense to remand the issue based solely on the procedural aspect of the court's dismissal. For similar reasons, we need not address Insight's argument that the district court should have analyzed the motion to reconsider under C.R.C.P. 121, rather than C.R.C.P. 59.

## D. The Indemnity Provision

¶ 47    Insight next contends that the district court erred in its interpretation of the 2014 Agreement's indemnity provision and by concluding that the entire indemnity provision was void as against public policy. We agree. We first consider the effect of the court's ruling on the Estate's claim that Insight was vicariously liable for Hinson's negligence, which is separate from its claim that Insight was directly liable for its own negligent training and supervision. Next, we must determine whether the district court correctly concluded that the provision indemnified Insight only for Hinson's negligence, not Insight's own negligence. Finally, because the court suggested that Hinson's status as a loaned employee "drove [its] ruling that the indemnification clause . . . was void," we consider the effect of Hinson's loaned employee status.

26

### 1. Direct Negligence Versus Vicarious Liability

¶ 48 The district court's conclusion that the indemnity provision was void was based on its conclusion that the provision indemnified Insight for its own negligence. But the Estate brought separate claims against Insight for direct negligence *and* vicarious liability. So even if the court correctly concluded that the 2014 Agreement could not indemnify Insight for its *own* negligence because doing so would violate public policy — a conclusion we disagree with, as set forth in Part III.D.2 below — there was still a question as to whether the 2014 Agreement properly indemnified Insight for its *vicarious* liability for Hinson's negligence.

¶ 49 This is because, for purposes of indemnification, courts often treat claims based solely on vicarious liability differently from claims that also allege direct negligence. For example, our supreme court held that the Uniform Contribution Among Tortfeasors Act (UCATA), §§ 13-50.5-101 to -106, C.R.S. 2025, abrogated common law indemnity actions among joint tortfeasors. *Brochner*, 724 P.2d at 1299. But a division of this court concluded that the UCATA did not bar a common law indemnity action between an employer and employee when the complaint "alleged that [the employer] was liable

27

based *only* on a theory of respondeat superior, not negligence." *Serna v. Kingston Enters.*, 72 P.3d 376, 380 (Colo. App. 2002); *see also Linarello v. City Univ. of New York*, 774 N.Y.S.2d 517, 519 (App. Div. 2004) (Although indemnification clauses that indemnify an indemnitee for its own negligence are unenforceable under New York law, such provisions may be enforceable if "the indemnitee is found not negligent but nevertheless held vicariously liable.").

¶ 50    We disagree with Insight that the district court could not consider the provision's validity until there was a *finding* that Insight was directly negligent.[8]  Even so, the district court improperly conflated the Estate's separate *allegations* of Insight's direct negligence and Insight's vicarious liability for Hinson's negligence.  *See L.J. v. Carricato*, 2018 COA 3, ¶ 37 (Vicarious liability "is not based on the [employer's] own negligent acts. Rather, it is based on the [employer's] vicarious liability for" the

---

[8] We also do not address Insight's argument about who was responsible for supervising or directing Hinson's patient care because Insight does not challenge the district court's loaned employee determination concluding that Insight was responsible for such supervision and direction.  *See Armed Forces Bank, N.A. v. Hicks*, 2014 COA 74, ¶ 38 (deeming arguments not raised on appeal as abandoned).

employee's actions. (citation omitted)). Here, the court concluded that the *entire* indemnity clause was void based on its conclusion that the clause should not apply to Insight's own negligence. Thus, it erred by treating the Estate's claims against Insight for vicarious liability and direct negligence in the same manner.

2. The Indemnity Provision Covered Insight's Own Negligence and Was Not Void as Against Public Policy

¶ 51    As noted, in its oral ruling at the September 7 status conference, the district court concluded that the indemnity provision was void as against public policy because it indemnified Insight for its own negligence. But in its order denying Insight's motion for reconsideration, the court determined, somewhat inconsistently, that the indemnity provision lacked "clear and unequivocal language holding Insight harmless for its own negligent acts" and thus did not indemnify Insight for its own negligence. The court nonetheless maintained its ruling that the provision was void as against public policy. We conclude that the court erred both in its interpretation of the provision and in declaring it void as against public policy.

¶ 52     In Colorado, a provision that "indemnif[ies] a party against liability for its own negligence *will* be enforced as written as long as it contains a clear and unequivocal expression that the parties intended that result." *Constable v. Northglenn, LLC*, 248 P.3d 714, 716 (Colo. 2011).  In commercial contracts between sophisticated parties, Colorado appellate courts have found "broad language of indemnity holding another harmless against liability generally, without any specific reference or limitation to its own negligence, to constitute an adequate expression of intent to indemnify to the extent . . . otherwise permitted by public policy." *Id.*

¶ 53     For example, in *Constable*, the supreme court held that the following provision encompassed the indemnitee's own negligence: "Constable agrees to . . . indemnify Northglenn from and against any and all losses, damages, liability, claims, suits or actions, . . . due to any bodily injury sustained in the shopping center's community areas by . . . [shopping center visitors] or as a result of Constable's business." *Id.* at 716-17 (citation modified).  The "'any and all' language" supported the court's conclusion that the clause covered Northglenn's own negligence.  *Id.* at 717.

¶ 54     Our supreme court reached the same conclusion about a provision "requiring United Cable to 'indemnify . . .' Public Service from and against all claims and liabilities in any way arising out of the rights granted United Cable." *Pub. Serv. Co. of Colo. v. United Cable Television of Jeffco, Inc.*, 829 P.2d 1280, 1283 (Colo. 1992). Although the clause did not explicitly mention Public Service's negligence, it applied to "all claims, liabilities, causes of action, or other legal proceedings," which was sufficient to include Public Service's negligence. *Id.* (emphasis omitted) ("The use of the word 'liabilities' is significant because it covers those instances where Public Service is legally liable for damages, including those where liability arises because of its own negligence.").

¶ 55     In *Lafarge North America, Inc. v. K.E.C.I. Colorado, Inc.*, 250 P.3d 682, 685 (Colo. App. 2010), a division of this court considered a provision in which K.E.C.I. agreed to indemnify Lafarge "from any and all claims, suit, or liability" that arose "in whole or in part [from] . . . any act or omission of [K.E.C.I.], or any of [its] officers, agents, employees, or servants." The division concluded that "the indemnity clause unambiguously require[d] K.E.C.I. to indemnify Lafarge for Lafarge's own negligence where Lafarge's liability

31

ar[o]se[] out of any incident which [was] at least partially the result of K.E.C.I.'s acts or omissions." *Id.* at 686.

¶ 56    The division emphasized that the clause "cover[ed] Lafarge's 'liability' and encompasse[d] such liability 'arising in whole or in part' from K.E.C.I.'s acts and omissions." *Id.* And it distinguished a case in which a division of this court concluded that an indemnity clause did not apply to an indemnitee's own negligence because that clause did not address "the indemnitee's 'liabilities' and did not broadly cover any liability arising 'in any way' from the indemnitor's acts." *Id.* at 686-87 (citing *Boulder Plaza Residential, LLC v. Summit Flooring, LLC*, 198 P.3d 1217, 1222 (Colo. App. 2008)).

¶ 57    Here, the indemnity provision required WSi to indemnify Insight "from any . . . liability . . . arising from or related to negligent . . . conduct of Temporary Staff, including . . . any other claim of any kind or character." Thus, as the district court acknowledged, the provision contained the critical "any liability" and "any other claim" language. *E.g.*, *id.* at 686; *Constable*, 248 P.3d at 717. Additionally, unlike the cases discussed above, this indemnity clause explicitly applied to negligent conduct. *See Constable*, 248 P.3d at 716.

¶ 58     But the district court concluded that the clause here was narrower than the other provisions because it indemnified Insight only for the negligent conduct of WSi's temporary staff. Although the provision in *Lafarge*, 250 P.3d at 685, similarly limited Lafarge's indemnity to the conduct of K.E.C.I. and its employees, the district court reasoned that "[i]t d[id] not limit indemnity to one particular class of . . . employees." The district court here further reasoned that the language paralleled *Boulder Plaza*, in which the indemnity provision was limited to "all claims for damage . . . growing out of the execution of the work.'" 198 P.3d at 1220. We disagree.

¶ 59     The fact that the indemnity provision required WSi to indemnify Insight for a particular class of WSi employees' negligence does not persuade us that the parties intended to exclude indemnity for *Insight's* negligence. The division in *Lafarge* emphasized the provision's inclusion of liability arising wholly or partly from K.E.C.I.'s conduct, and it distinguished *Boulder Plaza* because the agreement there lacked such language, not because the provision limited indemnification to a specific circumstance or class of persons. *Lafarge*, 250 P.3d at 686-87. Moreover, the division in *Boulder Plaza* also emphasized that the indemnification clause at

33

issue lacked the "liabilities" and "in any way" language. 198 P.3d at 1222 (citing *Pub. Serv. Co.*, 829 P.2d at 1283).

¶ 60 Limiting indemnification to claims that "grow[] out of the execution of the work," *id.* at 1220, is significantly narrower than indemnification for any liability "arising from or related to" the negligence of WSi's temporary staff. And the provision here, which indemnifies Insight from conduct "arising from or related to" the temporary staff's negligence is even broader than the *Lafarge* provision, which included liability "arising in whole or in part" from K.E.C.I.'s conduct. 250 P.3d at 686; *see also In re Estate of Gattis*, 2013 COA 145, ¶ 40 (explaining that courts have interpreted the phrase "relating to" as broader than the phrase "arising out of" (citation omitted)).

¶ 61 We therefore conclude that the 2014 Agreement requires WSi to indemnify Insight for its own negligence when Insight's liability arises from or is related to the negligent conduct of WSi's temporary

staff.[9]  *See Lafarge*, 250 P.3d at 686.  This includes Insight's direct and vicarious liability in a wrongful death action stemming from an incident involving a WSi nurse's allegedly negligent care of an Insight patient.  The district court erred by concluding otherwise.  And because it is clear and unequivocal, this type of provision is enforceable in Colorado.  *See Constable*, 248 P.3d at 716.

¶ 62    Finally, we briefly address and reject WSi's argument that *Brochner*, 724 P.2d at 1299, supports the district court's conclusion.  Applying the UCATA, *Brochner* "abolished the common law doctrine of indemnity as between two joint tortfeasors," such that "one of two joint tortfeasors can no longer maintain an indemnity claim against the other for reimbursement of the entire amount paid as damages to the injured party."  *Block*, ¶ 33 (citing *Brochner*, 724 P.2d at 1299).  *Brochner* concerned common law indemnity, not contractual indemnity.  *See id.*; *see also Holly Sugar*

---

[9] The Maryland case that WSi cites in support of the opposite conclusion is not persuasive.  *See Bd. of Trs., Cmty. Coll. of Balt. Cnty. v. Patient First Corp.*, 120 A.3d 124, 132 (Md. 2015).  Maryland courts clearly require more explicit language in commercial agreements than do Colorado courts.  *See id.*

*Corp. v. Union Supply Co.*, 572 P.2d 148, 150 (1977) (distinguishing the types of indemnity).

¶ 63    We also reject WSi's reliance on section 13-21-111.5(6)(b), C.R.S. 2025. That section applies only to construction contracts and voids provisions that indemnify an indemnitee for its own negligence. *Id.* It is not applicable to the agreement here.

3.    Hinson's Loaned Employee Status Does Not Change the Result

¶ 64    Finally, we conclude that the indemnity clause entitles Insight to indemnification for Hinson's negligent conduct, and Hinson's status as a loaned employee does not alter this result.

¶ 65    We first reject WSi's contention that Insight failed to preserve its argument that Hinson's status as a loaned employee does not void the indemnity provision. Insight's motion for reconsideration argued that "the law does not require that WSi have control over . . . Hinson" for the indemnification agreement to be enforceable and that Hinson's status as Insight's agent does not void the clause. Insight raised "the sum and substance of the argument," which is sufficient to preserve the issue. *Marquez v. Schaefer*, 2025 COA 44, ¶ 30 (citation omitted).

¶ 66     WSi argues that "[a]n indemnification agreement trumps a loaned employee status only when the agreement clearly and unequivocally indemnifies the borrowing entity from the loaned employee's negligence."  Somehow, WSi then concludes that the 2014 Agreement, which explicitly indemnified Insight for WSi temporary staff's (i.e., Hinson's) negligence, did not meet this standard.

¶ 67     No Colorado appellate court has addressed the effect of the loaned employee doctrine on the enforceability of an indemnity agreement.  But other jurisdictions hold that the doctrine does not alter the analysis.  *E.g.*, *Stocker v. Shell Oil Co.*, 716 P.2d 306, 309 (Wash. 1986) ("[P]ublic policy considerations mandate enforcement of indemnity agreements, notwithstanding incidents of borrowed servant status."); *Sea Land Indus., Inc. v. Gen. Ship Repair Corp.*, 530 F. Supp. 550, 563 (D. Md. 1982) ("[W]hatever the status of an employee under the 'borrowed servant' doctrine, the parties may allocate between themselves the risk of any loss resulting from the employee's negligent acts."); *Interstate Fire & Cas. Co. v. Dimensions Assurance Ltd.*, 843 F.3d 133, 140 (4th Cir. 2016) ("[I]f the general employer and special employer have . . . contract[ually] assign[ed]

37

liability to one of the parties, courts will give effect to that contract."); *Sokolovic v. Throgs Neck Operating Co.*, 48 N.Y.S.3d 91, 92 (App. Div. 2017) (The "contractual obligation . . . to indemnify Throgs Neck was not altered or qualified in any way by the court's finding that the nurse was a special employee of Throgs Neck for the purposes of Throgs Neck's liability to plaintiff."). We conclude that Hinson's loaned employee status does not alter WSi's duty to indemnify Insight for the negligence of WSi's temporary staff.

¶ 68 Additionally, the clause is not invalid merely because WSi agreed to indemnify Insight for the negligence of WSi's loaned employees even if WSi was not directly negligent. *See United States v. Hollis*, 424 F.2d 188, 190 (4th Cir. 1970) ("It has long been settled law that a party may expressly agree to be held liable, even if the accident stems solely from the fault of another."); *Snohomish Cnty. Pub. Transp. Benefit Area Corp. v. FirstGroup Am., Inc.*, 271 P.3d 850, 853 (Wash. 2012) (explaining that indemnification agreements that indemnify against an indemnitee's sole negligence are not void as against public policy). And in Colorado, particularly among sophisticated parties to commercial contracts, "[s]trong policy considerations favoring freedom of contract generally permit

38

business owners to allocate risk amongst themselves as they see fit." *Constable*, 248 P.3d at 718.

¶ 69 Here, two sophisticated corporate entities agreed that WSi would indemnify Insight for the negligence of WSi's temporary staff. The "'borrowing' and 'loaning' of [WSi staff] is the essence of the . . . contract," while "indemnification for damage caused or claimed by these [loaned employees] is the precise purpose of the indemnity clause." *Stocker*, 716 P.2d at 309. Invalidating that agreement "would frustrate the clearly expressed intent of the parties and allow a patently unfair result." *Id.*

¶ 70 Finally, we decline to resolve the question left open in *Constable*: "whether an agreement to indemnify against a risk that is wholly within the control of an indemnitee might alter the public policy calculus or evidence too great a disparity in the bargaining power of the parties." 248 P.3d at 719. Although WSi cites this language, it does not develop the argument. *See Brown v. Am. Standard Ins. Co. of Wis.*, 2019 COA 11, ¶ 45 (declining to address a possible "issue of first impression in Colorado[] without the benefit of briefing"). Even so, the indemnity provision at issue here does not go that far. It necessarily requires Hinson to have been

negligent before any indemnity obligation attaches, and Hinson's negligence is not wholly within Insight's control.

¶ 71 Accordingly, we reverse the district court's order dismissing Insight's third-party claims and remand for further proceedings on the merits of this claim, including whether Hinson and/or Insight were negligent. However, we emphasize that the indemnity clause applies only to Insight's direct and vicarious liability for claims arising from or related to Hinson's negligence. Insight is not entitled to indemnity for any negligent conduct unrelated to Hinson's negligence, for the negligent conduct of non-WSi employees, or for the negligent conduct of WSi employees who do not qualify as "temporary staff" under the 2014 Agreement. In so concluding, we do not address any other arguments not sufficiently developed on appeal. *See Galiant Homes, LLC v. Herlik*, 2025 COA 3, ¶ 14.

## IV.   Disposition

¶ 72 We affirm the district court's order denying WSi's motion for a directed verdict, reverse the district court's order dismissing Insight's third-party claims, and remand for further proceedings.

JUDGE BROWN and JUDGE MEIRINK concur.